**UNITED STATES of America, Plaintiff,**

v.

**ONE HUNDRED AND THIRTY–FOUR THOUSAND, SEVEN HUNDRED AND FIFTY–TWO DOLLARS UNITED STATES CURRENCY, MORE OR LESS, Defendant-in-Rem.**

No. 87 Civ. 1884 (CSH).

United States District Court,
S.D. New York.

Jan. 24, 1989.

Gerald B. Lefcourt, P.C., New York City (Gary G. Becker, of counsel), for plaintiff.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (Cynthia Keefe Dunne, of counsel), for defendant-in-rem.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

By this action the plaintiff seeks forfeiture of $134,752 in United States currency. The government claims the money is traceable to a criminal transaction involving either narcotics or an illegal gambling operation prohibited by federal law, and thus forfeitable pursuant to 21 U.S.C. § 881 or 18 U.S.C. § 1955, respectively. By previous order dated January 4, 1987 I dismissed the government's complaint for failure to plead with particularity the basis for forfeiture, *see* Rule E(2), Supplemental Rules for Certain Admiralty and Maritime Claims, and granted leave to replead.

The government has now filed an amended complaint. The claimant, Ronald Hirschhorn, moved to dismiss the amended complaint on various grounds, for summary judgment and for costs. The government resist's Hirschhorn's motions and moves to strike his claim to the *res*. For the reasons stated below I grant claimant's motion for summary judgment and dismiss the government's complaint.[1]

## FACTUAL BACKGROUND

The facts immediately surrounding the seizure of the *res* are derived primarily from the affidavits of Andrew Rosenzweig, Chief Investigator for the New York County District Attorney's Office, and Camille Colon, Special Agent with the Drug En-

---

1. This forfeiture proceeding is related to another action wherein Hirschhorn challenged a termination assessment brought by the IRS with respect of the same $134,752. *See Ronald Hirschhorn v. United States of America,* 87 Civ. 2350 (CSH). A termination assessment is a proceeding whereby the IRS is allowed to figure and collect taxes immediately when circumstances exist which would make collection of the tax doubtful if less drastic methods were pursued. *See* 26 U.S.C. § 6861 and § 6862. In the related action I found the IRS's action to be unreasonable and therefore abated the assessment.

forcement Administration, both of which are appended to the amended complaint as Exhibit A. The government's version of those events is largely uncontested by Hirschhorn, who has not submitted an affidavit of his own in support of his motion.

On Wednesday, November 19, 1986, at approximately 2:45 p.m., Rosenzweig and another inspector for the New York County District Attorney's Office, Ralph Marchesano, were in the vicinity of a Citibank branch in Manhattan on an investigation unrelated to the present case. There Rosenzweig observed two males sitting in the front seat of a 1976 Ford automobile. The engine of the automobile was running. While making several "passes" of the vehicle, Rosenzweig "observed the two occupants counting and handling numerous one-hundred dollar bills." (Rosenzweig ¶ 3). After observing the two men in the car for a few minutes, Rosenzweig approached the vehicle, identified himself as a police officer and asked the occupants to exit the vehicle and provide identification. (Rosenzweig ¶ 4). Apparently while still seated in the automobile on the passenger side, Hirschhorn stated, "I don't have any ID on me. My name is Ronnie Hirschhorn, and I live around the corner." (Rosenzweig ¶ 5).

In accord with the inspector's request, the driver of the vehicle got out of the car. As he did, Rosenzweig observed on the floor/running board section of the vehicle three vials of what Rosenzweig believed were the type commonly used to hold cocaine. According to Rosenzweig, the vials were in plain view. (Rosenzweig ¶ 6). After exiting the vehicle the driver produced a Florida driver's license identifying himself as Bruce Gordon. On Rosenzweig's instructions, Inspector Marchesano then examined the vials, which he also concluded were of the type commonly used for co-

caine. (Rosenzweig ¶ 7). Hirschhorn and Gordon were then placed under arrest for criminal possession of a controlled substance and informed of their constitutional rights.

At some point while they were in the vicinity of the car, Rosenzweig or Marchesano asked Hirschhorn and Gordon what they were doing with such a large amount of cash. According to Rosenzweig, Hirschhorn responded: "It's for a down-payment on a house ... my wife is waiting in the bank and my maid is outside (the bank)." (Rosenzweig ¶ 7).

After their arrest Hirschhorn and Gordon and the car were taken to a local precinct house for processing. A search of the car turned up another cocaine vial and a black "billy club." (Rosenzweig ¶ 9). Discovery of the billy club resulted in Hirschhorn and Gordon being charged with possession of a weapon. Subsequent analysis of the vials showed that they were empty, except for a residue amount of cocaine.[2]

Soon after their arrest, special agents of the Drug Enforcement Administration were called in to question Hirschhorn and Gordon. Special Agent Camille Colon of the DEA arrived within an hour of the arrests and observed Gordon acting agitated, gesturing with his hands in an exaggerated fashion, and speaking very rapidly. (Colon ¶ 3). According to Colon, Hirschhorn was perspiring profusely, had bloodshot eyes and was constantly wiping his nose. (*Id.*) In his affidavit Colon says that "[b]ased upon my experience and my observations it was my opinion that both gentlemen probably had used cocaine prior to their arrests." (*Id.*). A count of the money, made up primarily of one hundred dollar bills, revealed that $134,752 had been seized.[3]

---

**2.** Claimant makes this assertion throughout his papers. Because the government does not contest it, I take it to be true.

**3.** The money consisted of the following denominations:

| | |
|---|---|
| 1179 | one hundred dollar bills |
| 246 | fifty dollar bills |
| 227 | twenty dollar bills |
| 1 | ten dollar bills |

2    one dollar bills

According to Special Agent Colon, "[t]hese denominations are consistent with drug-related proceeds, which must be 'laundered' or easily exchanged." (Colon ¶ 7). While large amounts of cash in relatively small denominations often appear at the site of street level drug manufacturing or dealing, so that its presence may be probative of the guilt of a particular individual

While in custody, there is evidence that Hirschhorn and Gordon made statements that could be interpreted as inconsistent. In Rosenzweig's words:

> I actually witnessed some of these comments, while others have been reported to me by other law enforcement officials. These statements include, but are not limited, to Hirschhorn stating that: (1) the money was earnings from a casino in Atlantic City; (2) the money was proceeds from a charity benefit attended by numerous dignitaries—we would be embarrassed to learn who attended; (3) the money was to buy a house, his wife and maid were waiting in the bank; (4) he was on his way to meet his wife at a nearby restaurant when we arrested him; ... On the other hand, Gordon stated that the money was a gambling debt that Hirschhorn owed to someone.

(Rosenzweig ¶ 12).

Hirschhorn and Gordon were eventually released from police custody, and on January 12, 1987 all criminal charges against them were adjourned in contemplation of dismissal. (Affidavit of Gary G. Becker, dated June 30, 1987, ¶ 5, hereinafter "Becker.")[4]

A follow-up investigation revealed these additional facts. Shortly before Hirschhorn was arrested, Hirschhorn entered the Citibank branch near where he and Gordon were arrested. He sought access to a safety deposit box registered to a couple by the name of Alan and Laura Benjamin. (Colon at Exhibit A). Laura Benjamin is a college friend of Hirschhorn's wife. (Affidavit of AUSA Cynthia K. Dunne, dated September 15, 1987, ¶ 9, hereinafter "Dunne").[5] Laura Benjamin's attorney told investigators that many years ago Hirschhorn asked her to open a safety deposit box, and, as a favor, she signed the authorization. She has never used the box and apparently does not know anyone by the name "Alan Benjamin." (*Id.*) Inside the bank Hirschhorn was unsuccessful in obtaining access to the box because it had been moved to another Citibank branch. When Hirschhorn was arrested, a photocopy of a signature card for the Benjamin safety deposit box and a number of safety deposit box keys were found in his possession. (Rosenzweig ¶ 13 and Exhibit A thereto).

Anonymous sources have told the government that Hirschhorn has no source of income other than from gambling, and his wife is unemployed. (Complaint ¶ 16). Hirschhorn resides at an expensive apartment on Manhattan's east side. (*Id.*) Because Hirschhorn and his counsel apparently told authorities that Hirschhorn derived gambling earnings from casinos, the government searched its files for any Currency Transactions Reports filed in Hirschhorn's name. Such reports must be filed by casinos on all cash transactions involving more than $10,000. *See* 31 C.F.R. § 103.11 *et seq.* The government's search revealed no such reports filed in Hirschhorn's name. (Dunne ¶ 8).

Further investigation also revealed that Hirschhorn and Gordon have criminal records, albeit somewhat dated. Gordon's criminal history includes numerous arrests and convictions for bookmaking and other criminal gambling offenses. (Complaint ¶ 18). Around 1974 Gordon was also arrested for criminal possession of a controlled substance. (Complaint ¶ 18; Claimant's Memorandum at 18). It is unclear from the papers before me whether that arrest resulted in a conviction. There is no indication in the papers that Gordon was ever arrested or convicted of an offense involving the sale or distribution of narcotics. Police intelligence also revealed that Gordon worked as a wireroom clerk for a

charged with a drug offense, this currency's denominations *per se,* particularly when found in circumstances not otherwise indicative of ongoing drug retailing, are not particularly probative.

**4.** Claimant's counsel says that a conviction for knowing possession of drugs will not lie under New York law where only a residue or trace amount of the drug is found. (Becker ¶ 4). If true, that fact may have influenced the government in its decision to drop the criminal charges.

**5.** Paragraphs in the Dunne affidavit are numbered "7, 8, 9, 8, 9." For purposes of citation in this opinion, I assume the more conventional "7, 8, 9, 10, 11" was intended.

major bookmaking operation in New York in the early to mid–1970s, and that in 1978 he went into business with an individual linked to organized crime. (Rosenzweig ¶ 14).

Hirschhorn has been arrested for a number of gambling offenses, grand larceny, forgery, burglary, and felonious assault. (Rosenzweig ¶ 11). It is unclear when those arrests occurred and which ones resulted in convictions. It is known, however, that Hirschhorn's most recent conviction, on a misdemeanor gambling offense, was in 1977. (Claimant's Memorandum at 17). Hirschhorn has never been arrested or charged with any crime related to drugs. (Claimant's Memorandum at 17).[6]

Affidavits submitted on behalf of the claimant shed additional light on events surrounding the seizure. According to the affidavit of Joseph Lango, a fireman employed for the past 17 years with the Asbury Park Fire Department of Asbury Park, New Jersey, the 1976 Ford automobile in which Hirschhorn and Gordon were arrested is owned by Lango. (Lango ¶ 2). Lango says he loaned the vehicle to Bruce Gordon on November 19, 1986, the day the *res* was seized. (Lango ¶ 3). Lango also says the billy club was his. "I kept this object in the vehicle for my own personal protection since I live and work in high-crime areas." (Lango ¶ 4). An affidavit submitted by Gordon also says Lango lent him the car. (Gordon ¶ 3). Gordon's affidavit also explains the presence of the cocaine vials. Paragraphs 4 and 5 of that affidavit read as follows:

4. Earlier that day, as I was getting dressed, I discovered the vials in the pocket of an old jacket that I was wearing. I didn't think too much of it at the time, but while I was driving to pick up Mr. Hirschhorn, I took the vials out of my jacket, put them in a white paper envelope, and placed it on the floor beside the driver's seat. By the time I arrived at Mr. Hirschhorn's the vials were already on the floor of the car out of sight.

5. All of the vials belonged to me. Before Mr. Hirschhorn and I were arrested I never told Mr. Hirschhorn that the vials were in the car and, as far as I know, Mr. Hirschhorn had no knowledge of their existence.

The government has presented no evidence attacking the credibility of Lango's or Gordon's affidavits.

On December 3, 1986 the Drug Enforcement Administration notified Hirschhorn that the currency had been seized and that steps were being taken to forfeit it. (Becker ¶ 7). In the ensuing weeks, counsel for Hirschhorn, Gerald B. Lefcourt, Esq. and Gary G. Becker, Esq., engaged in a number of communications with the government's attorneys with the purpose of persuading the government not to forfeit the seized currency. (Becker ¶¶ 8–12). In general, counsel's discussions with and letters to the government sought to convince the government that Hirschhorn had nothing to do with narcotics-related activities and that the seized money was in fact derived from gambling.[7] Counsel now disagree whether during certain in-person discussions counsel for claimant said that Hirschhorn's gambling included wagering with illegal gambling establishments. (*Compare* Plaintiff's Memorandum at 11–12 *with* Claimant's Memorandum at 20 n. 10). For reasons that appear below, I draw no

---

6. Neither the date of Hirschhorn's most recent conviction nor the assertion that he has never been charged with a drug offense are contested by the government. I therefore assume them to be true.

7. See, for example, Lefcourt's letter to Cynthia Dunne, Esq. dated January 12, 1987:

As my associate, Gary Becker, has indicated to you, that money is not the fruit of illegal drug distribution but rather was derived solely from Mr. Hirschhorn's legal gambling activities and should, therefore, be returned....

....
Set against this long history of involvement with gambling is the conspicuous absence in Mr. Hirschhorn's record of any prosecutions involving controlled substances....

....
Regardless of the ultimate disposition of the state case, all the available evidence supports the conclusion that the money seized from Mr. Hirschhorn had nothing to do with the alleged cocaine simultaneously seized....
(Claimant's Notice of Motion Exhibit 4).

inferences from the disputed communications between counsel.

Although all criminal charges were adjourned in contemplation of dismissal on January 12, 1987, the attempts by Hirschhorn's counsel to dissuade the government from forfeiting the money proved unfruitful, and on March 20, 1987 the government filed the complaint initiating this action. By Notice of Claim to Property dated April 6, 1987 Hirschhorn claimed an interest in the defendant-in-rem. Neither Gordon nor any other party besides Hirschhorn have contested the government's action. By stipulation dated September 9, 1987 the parties agreed to deposit the monies with the Court, pending the outcome of this action.

### DISCUSSION

The government claims the *res* in this case is subject to forfeiture under 21 U.S.C. § 881(a) (drug-related forfeiture), or, in the alternative, under 18 U.S.C. § 1955(d) (gambling-related forfeiture).

■ Subchapter I of Chapter 13 of Title 21, U.S.Code, deals with controlled substances and enforcement of that control. 21 U.S.C. §§ 801–904. 21 U.S.C. § 881(a) states in relevant part:

§ 881. Forfeitures

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

\* \* \* \* \* \*

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

18 U.S.C. § 1955 prohibits operation of an "illegal gambling business," as defined in the statute. 18 U.S.C. § 1955(d) provides in relevant part:

§ 1955. Prohibition of illegal gambling businesses

\* \* \* \* \* \*

(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizure, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs law; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures ... shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions.

In forfeiture actions such as this one, the burden of proving that the *res* is not subject to forfeiture is upon the claimant, provided, however, that the government has first demonstrated probable cause for the forfeiture. 19 U.S.C. § 1615.[8]

### A. Claimant's Standing

It is the government's contention that Hirschhorn lacks standing to contest the forfeiture. The government argues that Hirschhorn's and Gordon's own inconsistent statements concerning the source of the money and the generally suspicious circumstances surrounding their possession of the money cast doubt on whether Hirschhorn is the true owner of the money, and that Hirschhorn must therefore "come forward with additional evidence of ownership" or suffer judgment for the government. (Government's Memorandum at 21). In particular, the government cites Hirschhorn's statement that $70,000 of the $134,-

---

8. 19 U.S.C. § 1615 is made applicable to drug forfeitures by 21 U.S.C. § 881(d) and to gam- bling-related forfeitures by the express terms of 18 U.S.C. § 1955(d).

752 were proceeds of a charity benefit,[9] and the absence of any Currency Transaction Reports in Hirschhorn's name, to demonstrate the doubtfulness of Hirschhorn's ownership, and hence his standing. The government contests Hirschhorn's standing even though in the related IRS termination assessment case, *Hirschhorn v. United States,* 87 Civ. 2350 (CSH), it took the position that all of the seized funds constituted income taxable to Hirschhorn.

██ The government's current position must be rejected. It is well established that a possessory interest in the *res* is sufficient to confer standing upon a claimant. *United States v. $38,000 in United States Currency,* 816 F.2d 1538, 1544 (11th Cir.1987); *United States v. $122,043 in United States Currency,* 792 F.2d 1470, 1473 (9th Cir.1986). *Cf. United States v. $3,799 in United States Currency,* 684 F.2d 674, 678 (10th Cir.1982) (claimant who "had no actual or constructive possession" of the currency lacked standing). Here there is no dispute that Hirschhorn has, at a minimum, a possessory interest. The government, however, would deny Hirschhorn standing to challenge probable cause unless he proved a legal ownership interest in the *res* in addition to his possessory interest. A claimant's duty to demonstrate a legitimate source for the property seized is part of his ultimate burden, if the government first shows probable cause for instituting the action; but the government's argument accelerates claimant's burden while evading its own probable cause burden. This does not square with 19 U.S.C. § 1615. Authority cited by the government is not to the contrary.[10]

*B. Probable Cause*

██ To justify forfeiture of property alleged to be either drug or gambling related the government must demonstrate prob-

able cause. 21 U.S.C. § 881(d), 18 U.S.C. § 1955(d) (both incorporating 19 U.S.C. § 1615 and other procedures for customs forfeitures); *United States v. One 1986 Mercedes Benz,* 846 F.2d 2, 4 (2d Cir.1988) (drug related forfeiture). Probable cause exists when

the Government [has] reasonable grounds to believe that certain property is subject to forfeiture. These grounds must rise above the level of mere suspicion but need not amount to what has been termed "prima facie proof." *See United States v. $93,685.61,* 730 F.2d 571, 572 (9th Cir.) (per curiam), *cert. denied, Willis v. U.S.,* 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 61 (1984); *United States v. $22,287,* 709 F.2d 442, 446–47 (6th Cir.1983). The Government must have probable cause to connect the property with narcotics activity, *see United States v. $4,255,625.39,* 762 F.2d 895, 903 (11th Cir.1985) ("*SONAL* "), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986); *United States v. $22,287, supra,* 709 F.2d at 447; *United States v. $364,960,* 661 F.2d 319, 323 (5th Cir. 1981), but need not link the property to a particular transaction, *see SONAL, supra,* 762 F.2d at 904; *United States v. Brock,* 747 F.2d at 904; *United States v. Brock,* 747 F.2d 761, 762–63 (D.C.Cir. 1984) (per curiam). If the Government satisfies the probable cause requirement, the claimant bears the ultimate burden of proving that the factual predicates for forfeiture have not been met. *See* 19 U.S.C. § 1615.

*United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1160 (2d Cir.1986). The government does not meet its burden unless it shows probable cause for believing a "substantial connection" exists between the property and the criminal activity which the law seeks to prevent. *United*

---

**9.** Rosenzweig ¶ 10.

**10.** The government relies primarily upon *United States v. $364,960,* 661 F.2d 319 (5th Cir.1981). There the Fifth Circuit held that one who claims an interest in the *res* as an assignee must demonstrate that the assignor held a valid ownership interest in the seized property at the time of the assignment. *Id.* at 326–27. That holding,

which expressly addressed the situation "[w]here ... the party challenging forfeiture is not the person in possession of the property at the time it was seized but instead purports to be an assignee of that person," is not applicable to the case at hand where the claimant has a possessory interest.

*States v. $38,600 in United States Currency*, 784 F.2d 694, 697 (5th Cir.1986); *United States v. $4,255,000*, 762 F.2d 895, 902–3 (11th Cir.1985), *cert. denied, sub nom, $4,255,625.39 v. United States*, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986) (describing that requirement's basis in the legislative history). Probable cause to believe the property is related to *some* illegal activity does not permit its forfeiture. *United States v. $38,600, supra*, 784 F.2d at 698–99. There must be probable cause to believe the property is linked to the activity proscribed in the relevant statute. *Id.* Probable cause must be shown to have existed at the time the forfeiture proceeding was instituted. 19 U.S.C. § 1615; *United States v. Banco Cafetero International*, 608 F.Supp. 1394 (S.D.N.Y.1985), *aff'd*, 797 F.2d 1154, 1160 (2nd Cir.1986) ("the government must show that it had probable cause at the time of the commencement of the actions").[11]

■ Summary judgment is appropriate if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). On a motion for summary judgment, the court focuses upon "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Thus, in a forfeiture case, the claimant may properly test the existence of probable cause on a motion for summary judgment, so long as there is no genuine issue of material fact requiring trial.[12] *E.g. United States v. One 1981 Cadillac Eldorado*, 535 F.Supp. 65 (N.D.Ill.1982) (granting claimant's motion for summary judgment on a finding of no probable cause). In the case at bar the government has presented in its complaint and by affidavit those facts which it contends establish probable cause. The claimant has not contested the government's factual contentions, although he does vigorously dispute the government's ultimate conclusion that those facts establish probable cause to believe there is a substantial connection between the forfeited *res* and federally-prohibited drug or gambling activity. The issue of probable cause is therefore ripe for summary judgment.[13]

11. Claimant maintains that certain of the evidence presented by the government was obtained subsequent to the filing of the first complaint and therefore should be disregarded. (Claimant's Memorandum at 13–14 n. 6). Although I do not foreclose claimant from pursuing that argument at a later date if so advised, for purposes of the present opinion I assume all evidence presented by the government was timely obtained.

12. In *United States v. Banco Cafetero Panama, supra*, 797 F.2d at 1162 (2d Cir.1986), the Second Circuit made this observation: "Under the drug forfeiture statute, the Government may seize property upon the filing of a complaint and need not demonstrate probable cause until the forfeiture trial. *See* 21 U.S.C. § 881(b); *United States v. One 1978 Mercedes Benz*, 711 F.2d 1297, 1302 (5th Cir.1983)." The government seizes on that language to argue that under no circumstances may probable cause be tested before trial. (Government Memorandum at 18–19). I reject that argument. In *United States v. Banco Cafetero Panama* the issue before the court was whether the claimant was entitled to an immediate probable cause hearing or whether such a hearing should be delayed until the claimant was extradited and tried on criminal charges. The issue was not *whether* there should be a trial but *when*. The court concluded that an immediate hearing was not necessary and that the government could wait until the forfeiture trial to prove probable cause. *Id.* at 1162–63. There was no motion for summary judgment in that case, as all parties apparently agreed a trial of factual issues was needed. That is not the situation here. F.R.Civ.P. 56 and well established principles governing summary judgment remain applicable to the case at bar, as to any other. *See U.S. v. One 1981 Cadillac Eldorado*, 535 F.Supp. 65 (N.D.Ill.1982) (granting claimant's motion for summary judgment upon a showing of no probable cause).

13. Among other reasons, the government maintains that claimant's motion for summary judgment should be denied because claimant has failed to file a concise statement identifying those facts to which there is no dispute. *See* Local Civil Rule 3(g). Claimant's omission disregards the rule. However, because the government has not demonstrated why it is prejudiced by claimant's failure, and because the relevant facts are apparent from both parties' exhaustive briefs and affidavits, I conclude plaintiff's motion survives this technical defect.

### 1. Forfeiture Pursuant to 21 U.S.C. § 881

■ Title 21 U.S.C. § 881(a)(6) makes subject to forfeiture "all moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys ... used or intended to be used to facilitate any violation of this subchapter...." In support of his motion for summary judgment, Hirschhorn contends the government has not met its threshold burden of showing that probable cause exists to believe the money seized had a substantial connection to such an exchange involving drugs. Viewing the facts in the light most favorable to the government, as I am required to do in the context of a motion for summary judgment, I must agree with the claimant that probable cause for forfeiture under 21 U.S.C. § 881 does not exist in this case.

The evidence presented by the government may well support a reasonable belief that Hirschhorn had in the past, and perhaps even at the time of the seizure, participated in illegal activity of some type. The quantity of money seized, Hirschhorn's criminal record and his association with Gordon who also has a criminal record, the evasive and inconsistent statements Hirschhorn and Gordon made after their arrest, and the apparent lack of lawful means of support, are all evidence, albeit circumstantial, of illegal activity. I credit them accordingly. However, the legally relevant question is not whether Hirschhorn may have participated in illegal activity, but whether there is evidence linking the *res* to an exchange involving a controlled substance; and there the proof is much weaker.

It is common ground that Hirschhorn has never been arrested for any offense involving a controlled substance. Nor is there any allegation by the government that he has ever been under investigation for such an offense. Gordon was arrested for possession of a controlled substance, but that was approximately 14 years ago.[14] The government does not allege that Gordon has ever been arrested for, or suspected of, selling narcotics. Admittedly, cocaine vials were found in the vicinity of the seized currency, and it was the opinion of Special Agent Colon that the two men had used cocaine before their arrests. However, the vials were found on the floor of the car near the driver's seat where Gordon was sitting, and thus they give credence to Gordon's sworn statement that they were his and that Hirschhorn had no knowledge of them. The government has not contested Gordon's explanation of the vials, and I may therefore accept it. But even if I did not, and found instead that Hirschhorn knew of their existence, that fact still would not furnish probable cause for believing the money found in the car had a substantial connection to an illegal exchange involving drugs. Title 21 U.S.C. § 881(a)(6) permits forfeiture of money "furnished or intended to be furnished ... in exchange for a controlled substance[,] proceeds traceable to such and exchange, and moneys ... used or intended to be used to facilitate any violation of this subchapter." The $134,752 was obviously not "furnished" to purchase the four vials of cocaine since the money was still in Hirschhorn's possession. Furthermore, there is no evidence that the money was intended to be furnished to purchase a quantity of drugs (apparently a large one) in the future; that it was the proceeds of a previous sale; or that it in any way facilitated a violation of the drug laws.

The facts of this case are closely analogous to those found in *United States v. $38,600 in U.S. Currency*, 784 F.2d 694 (5th Cir.1986). In that case the claimant was pulled over in his car at a permanent Border Patrol checkpoint in Texas. Border Patrol agents questioned the driver and received inconsistent and evasive responses. Upon smelling marijuana, they searched the vehicle and found in the passenger compartment a small pipe bearing

---

**14.** Claimant says this arrest occurred in 1974. (Claimant's Memorandum at 18.) The government gives no particulars about the arrest, and does not argue with the claimant's date. I therefore assume 1974 to be correct.

marijuana residue, a package of cigarette papers, a small pair of scissors, and a small metal box. Their search also revealed $38,600 in U.S. currency hidden underneath the bottom portion of the car's back seat. The government initiated forfeiture proceedings and the district court agreed the money was forfeitable. On appeal the Fifth Circuit correctly observed that "a large amount of money, found in combination with other persuasive circumstantial evidence, particularly the presence of drug paraphernalia, is frequently held sufficient to establish probable cause." 784 F.2d at 698. The court found, however, in a conclusion equally applicable to the case at bar, that the facts before it were easily distinguished from other cases where forfeiture had been permitted. The court said:

> [T]he discovery of a pipe bearing marijuana residue and rolling papers, while relevant, is certainly not as compelling as the evidence presented in the many other reported cases which disclosed that the defendants had either admitted the money's intended purpose or could be linked to narcotics transactions by testimony of past drug-related activities, more incriminating drug paraphernalia, or the discovery of actual drugs. *See* [citations omitted].

784 F.2d at 698. The court went on to find that

> the $38,000 discovered in Alvaro Freitas' car, even when considered in conjunction with the pipe and rolling papers and Alvaro's evasiveness concerning his destination and the money's owner, is insufficient to sustain the district court's finding. As we have earlier suggested, this evidence may very well give rise to a reasonable belief that there exists a connection between the money seized and *some* illegal activity; here, however, the evidence gives rise only to a suspicion of a connection between the money seized and its use in a transaction for a controlled substance.

*Id.* at 699.

Similarly, in cases in this circuit where drug-related forfeiture has been upheld, the evidence supporting forfeiture was far stronger than in the case at bar. *See, e.g., United States v. One 1986 Mercedes Benz,* 660 F.Supp. 410 (S.D.N.Y.1987), *aff'd,* 846 F.2d 2 (2d Cir.1988) (per curiam) ($2,710 seized from car containing marijuana cigarette after subjects of an on-going drug investigation got into car after leaving house where DEA agents had earlier purchased a large quantity of heroin); *United States v. $2,500 in United States Currency,* 689 F.2d 10 (2d Cir.1982), *cert. denied, sub nom, Aponte v. United States,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984) (defendant found with $2,500 cash, surveillance revealed no other apparent explanation, defendant recently sold DEA agents $16,000 worth of heroin and offered to sell more, money discovered with a notepad of recorded drug transactions). Thus, although the government has presented evidence sufficient to support a reasonable belief that there exists a connection between the $134,752 and *some* illegal activity, it has not provided evidence that gives rise to more than a suspicion of a connection between the money and a transaction involving a controlled substance.

### 2. Forfeiture Pursuant to 18 U.S.C. § 1955

Subsection (d) of 18 U.S.C. § 1955 provides that any property used in violation of § 1955 may be forfeited to the United States. Enacted as part of the Organized Crime Control Act of 1970, 18 U.S.C. § 1955 provides criminal sanctions for anyone who "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business." 18 U.S.C. § 1955(a). "Illegal gambling business" is defined in subsection (b) as a gambling business which:

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in

excess of thirty days or has a gross revenue of $2,000 in any single day. 18 U.S.C. § 1955(b). Any participant in the operation of an illegal gambling business "conducts" the business under this section, except customers and persons placing bets. *Sanabria v. United States*, 437 U.S. 54, 70 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43; *United States v. Becker*, 461 F.2d 230, 232 (2d Cir.1972), *vacated on other grounds*, 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1974).

■ As with drug-related forfeiture, the government must first prove probable cause to believe the *res* was used in violation of § 1955 before the burden of proof shifts to the claimant to show the legitimate provenance of the *res*. Because forfeiture under § 1955 is *in rem* and not *in personam*, forfeiture may reach the property interests of third parties who are not active wrongdoers. *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 683, 94 S.Ct. 2080, 2091, 40 L.Ed.2d 452 (1974); *United States v. Bonanno Organized Crime Family*, 683 F.Supp. 1411 (E.D.N.Y.1988); *United States v. Premises and Real Property at 614 Portland Avenue*, 670 F.Supp. 475 (W.D.N.Y.1987), *aff'd on other grounds*, 846 F.2d 166 (2d Cir. 1988).

Here there is no dispute that both Hirschhorn and Gordon have histories of gambling activity. Chief Investigator Rosenzweig's affidavit at paragraph 14 says police sources indicate Gordon was employed as a wireroom clerk in a major bookmaking operation in the mid–1970s, and that in 1978 he associated with an individual thought to have connections to organized crime. According to the complaint, "Gordon's criminal history includes numerous arrests and convictions for bookmaking and other criminal gambling offenses." (Complaint at ¶ 18). However, nothing in the government's evidence constitutes proof that Gordon was involved with illegal gambling after the last half of the 1970s.

Hirschhorn also has a history of illegal gambling activity. According to the complaint, Hirschhorn has "numerous" arrests for promotion of gambling, possession of bookmaking records and bookmaking. (Complaint at ¶ 15). The government does not specify when these arrests occurred. Although it cites no source for the allegation, the government further contends that Hirschhorn has been involved with numerous large-scale gambling operations that operate in violation of 18 U.S.C. § 1955. (Complaint at ¶¶ 15, 26). The government also alleges that anonymous sources indicate Hirschhorn has no source of income other than from gambling, and that he lives in an expensive apartment on Manhattan's east side. (Complaint at ¶ 16).

Hirschhorn does not deny he is a gambler, nor does he contest the government's version of his criminal history, although he does stress that his last gambling arrest was for a misdemeanor more than ten years ago. (Claimant's Memorandum at 17). He also points out that the occupation he lists on his tax returns, "wagering," is an entirely legitimate one as far as the IRS is concerned. (Claimant's Memorandum at 18, *citing IRS v. Groetzinger*, 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987)). His attorney, Gerald B. Lefcourt, Esq., says in a letter to the government dated January 12, 1987 that he personally knows Hirschhorn to be a compulsive gambler. "Be it the racetrack, the casino, the lottery, dog racing, or basketball, baseball or football, Ronnie was always risking his money on games of chance," says Lefcourt. (Claimant's Notice of Motion, Exhibit 4).

■ As with Gordon, the government does not appear to have any proof that Hirschhorn has been involved with illegal gambling in the last decade.[15] I note, how-

---

**15.** Assistant United States Attorney Dunne's affidavit dated September 15, 1987 recounts a conversation she had on February 27, 1987 with former Assistant District Attorney Ronald Goldstock, who apparently was involved with an investigation of illegal gambling that culminated in Hirschhorn's arrest. Dunne does not specify the date of that arrest, however. Counsel for Hirschhorn represents that Hirschhorn was last arrested in 1977. (Claimant's Memorandum at 17). Because the government does not contest that statement, I assume the arrest referred to in Dunne's affidavit is the one that occurred in 1977.

ever, that there is some dispute whether claimant's attorneys conceded during out-of-court conversations with the government's counsel that Hirschhorn sometimes placed bets with "bookies." AUSA Dunne in her affidavit of September 15, 1987 says Gary G. Becker, Esq. told her during a conference held on December 9, 1986 that Hirschhorn places bets with bookies. (Dunne ¶¶ 2, 6). Becker denies Dunne's account, saying instead that he "explained that Mr. Hirschhorn derived the seized currency through *legal* gambling activities." (Becker ¶ 8). I agree with claimant's counsel that any conversations with the government's attorney were in the nature of settlement discussions and are therefore inadmissible under Federal Rule of Evidence 408, and that it would violate public policy if they were considered by this Court. They will therefore play no part in my decision, although even if they did my decision would not be altered.

■ In sum, the government has presented no direct evidence that the *res* in this case was used in violation of 18 U.S.C. § 1955. There is no proof whatsoever that at the time the complaint was filed Hirschhorn was conducting an illegal gambling operation at any location or in any manner. Nor is there proof that Hirschhorn won the $134,752 by betting with an illegal gambling operation. The facts of this case thus stand in stark contrast to the more typical case where forfeiture is permitted pursuant to § 1955(d) based on strong evidence linking the *res* to the gambling activity. *Cf. United States v. Premises and Real Property at 614 Portland Avenue,* 670 F.Supp. 475 (W.D.N.Y.1987), *aff'd,* 846 F.2d 166 (2d Cir.1988) (undercover investigators observed gambling activity on premises on 27 occasions over four and one-half month period resulting in seizure of property in which gambling occurred). Nothing ties this *res* to any form of illegal gambling except, in the most circumstantial fashion, Hirschhorn's ten-year criminal history, the generally suspicious circumstances under which the money was discovered by the

police and the fact, readily conceded by claimant's counsel, that Hirschhorn is a compulsive bettor. These facts do not give rise to more than a suspicion that the *res* was derived in connection with illegal gambling of any sort, let alone gambling of the particular characteristics delineated in 18 U.S.C. § 1955.[16]

I thus conclude, as I did in the drug context, that while evidence in this case gives rise to a strong suspicion, perhaps even probable cause, to believe the *res* played some role in *some* illegal activity, it does not give rise to a reasonable belief, supported by more than mere suspicion, that the *res* was in fact used in violation of the relevant forfeiture statute. If I reached the opposite result, any person with a history of illegal gambling activity could have his property seized by the government any time that property was discovered in suspicious circumstances implicating any sort of illegal activity. Such a result is without basis in the in law and would put at risk fundamental constitutional guarantees against unreasonable seizures.

## CONCLUSION

Claimant's motion for summary judgment is granted. The Clerk is directed to dismiss the complaint with prejudice for lack of probable cause. Plaintiff's motion to strike the claim of Ronald Hirschhorn is denied. No opinion is expressed on matters not expressly addressed herein, including, but not limited to, claimant's motions to dismiss brought pursuant to F.R.Civ.P. 12(b)(6), the Supplemental Rules of Admiralty & Maritime Claims and the fourth and fifth amendments to the United States Constitution. The government is directed to turn the *res* and any accrued interest over to the claimant no later than 5 days after the time for filing an appeal of this decision has expired. If an appeal is timely filed, I direct that the operation of this order be

---

**16.** In the view I take of the case, I need not reach the issue, debated at length by the parties, of whether the winnings of a bettor at an illegal gambling business falling within § 1955 are subject to forfeiture.

stayed pending a decision by the Court of Appeals.

The foregoing is SO ORDERED.