**UNITED STATES of America, Plaintiff,**

v.

**$37,590.00, Defendant In–Rem.**

**No. 88 Civ 0429 (CSH).**

United States District Court,
S.D. New York.

May 7, 1990.

---

Peter J. Neufeld, New York City, and James H. Fosbinder, Tuscon, Ariz., for claimant Bennett Masel.

James L. Cott, Asst. U.S. Atty., New York City, for U.S.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The United States of America has brought this action seeking the forfeiture of $37,590.00 seized from Bennett Masel on June 2, 1987. Masel, the claimant, now moves to dismiss the complaint.

### Background

On or about June 2, 1987, two plainclothed law enforcement officers, police officer Jeffrey McCormick and DEA agent James Mueller, were waiting to execute a search of the second floor apartment at 9 Bleeker Street, New York City. Mueller Aff. ¶ 7; McCormick Aff. ¶ 5. The resident of the second floor apartment, Irwin Dana Beal, had been arrested that day for selling an unspecified amount of marijuana and/or hashish. Guerriere Aff. ¶ 7. Beal had allegedly made statements to an undercover officer about large quantities of marijuana he had for sale in his apartment. *Id.* at ¶ 8. On the basis of those statements, several law enforcement agents applied for a search warrant of his apartment while the above-named officers, McCormick and Mueller, secured the premises "to prevent

anyone from moving evidence in or out of the building while [they] waited for a search warrant to arrive." Mueller Aff. ¶ 5.

9 Bleeker Street is a three story building. The first floor is the office, headquarters and meeting room of the Youth International Party ("YIP"). The second floor is Beal's private residence. It is accessible solely through a door off the second floor landing. The printing operations of YIP are located on the third floor. It is there that the organization publishes its newspaper, a book entitled "Blacklisted News," and various other periodicals and leaflets. Torbush Aff. ¶ 1–3.

While officers McCormick and Mueller were securing the premises, Bennett Masel walked up to 9 Bleeker Street and knocked repeatedly on the front door. Mueller Aff. ¶ 8. According to officer Mueller, "Masel did not appear to have a key . . .; however, it was clear from the way he was looking up to the windows on the upper floor of the building that he had some connection with the premises." Mueller Aff. ¶ 8.

The two officers approached Masel. They identified themselves as police officers and told Masel they wanted to talk to him. Officer McCormick immediately displayed his police identification and his gun. McCormick Aff. ¶ 17. Officer Mueller had a DEA badge around his waist and a gun on his hip. Mueller Aff. ¶ 17. The officers first advised Masel that no one could go in or out of the building until after the warrant had arrived. McCormick Aff. ¶ 7. Then, they began asking Masel repeatedly to identify himself and to state his business. McCormick Aff. ¶ 8. According to the officers, Masel "became verbally abusive and refused to answer [any] questions. He used many profanities and drew attention to himself and the scene around [them]." Mueller Aff. ¶ 10. Masel began yelling: "The police are going to hurt me." McCormick Aff. ¶ 8.

After repeated questioning, Masel finally responded that he sometimes lived at 9 Bleeker Street, that he has his mail delivered there, and that the people who lived there were his friends. McCormick Aff. ¶ 9.

The officers state that Masel was visibly nervous. He was carrying two bags, a blue nylon book bag and a shoulder bag. According to Mueller, Masel was in fact "clutching tightly" his bags. Mueller Aff. ¶ 12. The officers asked him what he had in his bags. Masel refused to answer. According to McCormick, "[a]fter Masel refused to respond to our inquiries as to what he had in his bags, I pull [sic] the bags forcefully from him and put them on the ground as if they contained explosives. While Mueller restrained Masel from fleeing, I opened the bag . . ." McCormick Aff. ¶ 12. According to Mueller, Masel "started to go into his shoulder bag" just before the officers removed and searched his bags. Mueller Aff. ¶ 12.

Inside the bags, McCormick found (1) a petition, with approximately 4,000 signatures, calling for the impeachment of President Reagan, Vice–President Bush and Attorney General Meese for their involvement in the Iran/Contra affair, (2) $37,590.00 in currency, and (3) about 10 seeds in a small plastic bag. Mueller Aff. ¶ 15; Neufeld Aff. ¶ 6.

The officers believed that the seeds were marijuana seeds. They arrested Masel for violating the narcotics laws. They seized the seeds and the money, but not the petition. Mueller Aff. ¶ 16.

Masel began "yelling" that his arrest was a political conspiracy and that the police were "going to hurt him." Mueller Aff. ¶ 16; McCormick Aff. ¶ 8. Masel told the officers that the money he was carrying "was for political advertising and had been collected all over the United States." Stadnyk Aff. ¶ 8; McCormick Aff. ¶ 13 ("collected from donations he had received that day").

According to the managing editor of the Youth International Party newspaper, Alice Torbush, Masel was one of several national organizers of the campaign to impeach President Reagan for his involvement in the Iran/Contra affair during the spring of 1987 and he frequently collected funds from local grassroots organizations

for the campaign. Torbush Aff. ¶ 5. According to his attorney, Merrill Rubin, Masel was a member of the Grassroots Campaign and the Grassroots Impeachment Inquiry, and, until June of 1987, was acting treasurer for the Grassroots Impeachment organization. Rubin Letter ¶ 1. These organizations had accumulated contributions in excess of $30,000 by May 1987 and had agreed to take out a full page advertisement in the Sunday New York Times. Masel indicated that the cost of such an advertisement would be a little less than $40,000. Masel Aff. ¶ 10. Masel had travelled to New York to arrange the advertising. He was using the offices of "Overthrow Magazine" on the third floor of 9 Bleeker Street to do the graphic, typesetting and layout for the ad. Rubin Letter ¶ 5–7.

The police obtained the search warrant at approximately 7:45 p.m. and carried out the search of the second floor apartment of 9 Bleeker Street. The police seized marijuana and peyote mushrooms from the second floor apartment. Guerriere Aff. ¶ 12–13. The police also discovered two pieces of identification belonging to Masel during the search. It is not clear from the affidavits, however, whether the identification was found in the second floor apartment or elsewhere on the premises of 9 Bleeker Street. Complaint ¶ 11; Guerriere Aff. ¶ 14.

On October 29, 1987, the charge against Masel for possession of marijuana was dismissed by the New York County District Attorney for lack of prosecutorial merit. Neufeld Aff. ¶ 6; Guerriere Aff. ¶ 16. The alleged marijuana seeds were not tested and thus never determined to be marijuana. Despite the dismissal of the charge, however, the money was not returned to Masel. Instead, the government instituted these forfeiture proceedings under 21 U.S.C. § 881(a). Meanwhile, the Impeachment Campaign borrowed money and placed a ⅙ page advertisement in the New York Times calling for the impeachment of the President. Rubin Letter, page 3.

### Discussion

Masel petitions this Court to dismiss the forfeiture action and to direct the government to return the $37,590. Masel argues first that the complaint fails to state a claim because it does not make any factual allegation regarding a nexus between the money seized and any past or future narcotics transaction. Second, he contends that he is entitled to summary judgement because the undisputed facts do not support a finding of probable cause that the money was intended to be used for narcotics transactions. Third, he argues that the forfeiture action is impermissible as the fruit of a poisonous tree since the money was illegally seized.

The government responds, first, that the issue of probable cause need not be resolved until the time of trial and that summary judgment is not appropriate because there exist genuine issues of material fact as to whether the money is subject to forfeiture. Second, the government contests Masel's standing to challenge the forfeiture action. Finally, the government argues that the seizure of the money was not in violation of the Fourth Amendment.

Section 881(a) of Title 21, U.S.Code, makes subject to forfeiture "[a]ll monies ... furnished or intended to be furnished by any person in exchange for a controlled substance ... [or] used or intended to be used to facilitate any violation of [the laws regulating controlled substances]." 21 U.S.C. § 881(a)(6).

I have recently had occasion to state in some detail the law applicable to drug-related forfeitures. *United States v. $134,752 United States Currency*, 706 F.Supp. 1075 (S.D.N.Y.1989) (hereafter *"$134,752"*). In *$134,752*, law enforcement agents observed two men sitting in the front seat of a parked automobile, counting and handling numerous one-hundred dollar bills. One of the men, the claimant, "was perspiring profusely, had blood-shot eyes and was constantly wiping his nose." *Id.* at 1077. Upon visually inspecting the car, the agents observed three vials of the sort commonly used to hold cocaine on the floor of the vehicle. The two men were arrested, but subsequently released and the charges were dismissed. Further investi-

gation revealed that the claimant, who had no source of income other than from gambling, had a record of gambling offenses, forgery, burglary and felonious assault.

■ In *$134,752,* I first rejected the government's argument that the claimant, who was found in possession of the *res,* lacked standing to contest the forfeiture. As I noted there, "[i]t is well established that a possessory interest in the *res* is sufficient to confer standing upon a claimant." *Id.* at 1081 *(citing United States v. $38,000 in United States Currency,* 816 F.2d 1538, 1544 (11th Cir.1987), and *United States v. $122,043 in United States Currency,* 792 F.2d 1470, 1473 (9th Cir.1986)). I also rejected the government's contention that probable cause cannot be tested prior to trial and that forfeiture actions are not subject to summary judgment. *Id.* at 1082, n. 12.

With regard to the legal standard for forfeiture, I explained:

> The government does not meet its burden unless it shows probable cause for believing a "substantial connection" exists between the property and the criminal activity which the law seeks to prevent. Probable cause to believe the property is linked to *some* illegal activity does not permit its forfeiture. There must be probable cause to believe the property is linked to the activity proscribed in the relevant statute.

*Id.* at 1081–82 (citations omitted)

On the merits, I concluded that "although the government has presented evidence sufficient to support a reasonable belief that there exists a connection between the $134,752 and *some* illegal activity, it has not provided evidence that gives rise to more than a suspicion of a connection between the money and a transaction involving a controlled substance." *Id.* at 1084. I also found that the government had no proof that the claimant was involved in illegal gambling in the last decade and that the evidence did not give rise to a reasonable belief that the *res* was in fact used in violation of the gambling laws.

In the case at bar, the government also contends, as a preliminary matter, that Ma-

sel lacks standing to contest the forfeiture action and that probable cause cannot be tested before trial. I reject these contentions on the basis of my opinion in *$134,-752.*

■ Masel argues that he is entitled to summary judgment because the undisputed facts demonstrate that there is no probable cause connecting the seized property with narcotics activity. In forfeiture actions such as this one, the claimant carries the burden of proving that the property is not subject to forfeiture, provided, however, that the government first demonstrate probable cause for the forfeiture. 19 U.S.C. § 1615 (made applicable to drug-forfeitures through 21 U.S.C. § 881(d)). While the issue of probable cause is interesting, I need not reach it since the full-scale search of Masel's shoulder bags was not reasonable under the circumstances and the evidence in this forfeiture action must be excluded.

Under the Fourth Amendment, governmental searches conducted without a warrant or probable cause are unreasonable unless they fall within one of the Amendment's exceptions. One such exception is the *Terry* "stop and frisk" exception announced by the Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *United States v. Streifel,* 665 F.2d 414, 419–20 (2d Cir.1981).

In *Terry v. Ohio,* the Supreme Court held that, consistent with the Fourth Amendment, "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. at 1883.

The Court ruled that a *Terry* "stop and frisk" triggers the protection of the Fourth Amendment. 392 U.S. at 16, 88 S.Ct. at 1877. Nevertheless, since a "stop and frisk" is neither a "technical arrest[ ]" nor a "full-blown search[ ]," the Court announced that a predicate less than probable

cause would support such a search: officers may stop and frisk someone suspected of being engaged in criminal activity if they have a "reasonable suspicion" that he is armed and dangerous. *Id.* at 19, 88 S.Ct. at 1878. Thus, the Court noted:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, *and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or other's safety*, he is entitled for the protection of himself and others in the area *to conduct a carefully limited search of the outer clothing of such persons* in an attempt to discover weapons which might be used to assault him.

*Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. at 1884 (emphasis added).

In the Second Circuit, the legality of a stop and frisk depends on (1) "the nature and extent of the government's need for the stop, which must be judged according to the importance of its law enforcement interests under the circumstances," and (2) "the reasonableness of the stop, which depends mainly on the degree of police intrusion on the defendants' freedom of movement." *United States v. Pelusio*, 725 F.2d 161, 165 (2d Cir.1983). As the Second Circuit explained:

> To make a stop the law enforcement authority must be aware of "specific articulable facts" giving rise to a reasonable suspicion that the individuals to be stopped are engaged in criminal activity. Upon review, the court must consider the totality of the circumstances. The permissible duration and intrusiveness of an investigative stop depend on the extent of the law enforcement interest and the seriousness of the conduct giving rise to a reasonable suspicion of unlawful activity. The longer and the more intrusive

the stop, the stronger must be the justification for it.

*Id.* at 165–66 (citations omitted).

■ In the case at bar, for purposes of Fourth Amendment analysis there is no question but that the two officers "seized" Masel when they forcibly removed his shoulder bags, restrained him from fleeing and searched the bags. *See Terry*, 392 U.S. at 19, 88 S.Ct. at 1878. Accordingly, I must consider whether officers Mueller and McCormick had sufficient reasonable suspicion to justify the seizure. As the Supreme Court noted in *Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968), "[b]efore [the police officer] places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." 392 U.S. at 40, 88 S.Ct. at 1889.

■ Officers Mueller and McCormick were securing a three-floor building which housed a suspected "drug den" and the offices and operations of the Youth International Party. A man walked to the front door, knocked repeatedly and looked up "to the windows on the upper floor of the building." Mueller Aff. ¶ 8. The "upper floor" would be the third floor, which is where the printing operations of YIP are located. This is entirely consistent with what Masel told the policemen and with what his attorney stated to the United States Attorney's Office, namely, that Masel was engaged in political advertising and was using the printing operations of YIP to lay out the impeachment ad. Stadnyk Aff. ¶ 8; Rubin Letter ¶ 5–7. The fact that Masel was banging on the door and staring at the offices of YIP does not raise any suspicion that would justify further investigation.

Assuming that officers Mueller and McCormick believed Masel was staring at the windows on the middle floor of the building—where the suspected drug den was located—that would still not provide

reasonable suspicion to support a stop and frisk. Simply because someone is in the company of others who themselves are suspected or convicted of criminal activity does not alone provide the basis for a *Terry* stop and frisk; the reasonable suspicion must be particularized with respect to the suspect.[1] "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979). *Cf. United States v. Del Toro*, 464 F.2d 520, 521 (2d Cir.1972) (pat-down permissible where particularized belief that companion was armed bodyguard).

Officers Mueller and McCormick, however, did not "seize" Masel solely on the basis of his presence at 9 Bleeker Street. First, the officers identified themselves, displayed their badges and guns, and informed Masel that "no one could go in or out of the building until after the warrant had arrived." McCormick Aff. ¶ 7. Certainly, that warning would have been adequate to deflect any potential confrontation with an armed suspect. Nevertheless, instead of leaving matters as they stood, the officers began questioning Masel repeatedly: "I asked him repeatedly to identify himself, and what his business was at the premises. He again refused to answer ..." McCormick Aff. ¶ 8. Masel began acting nervous and yelling "political conspiracy."

Still, the police officers had not yet "seize" Masel. It is only after Masel refused to respond to the officers' inquiries about his shoulder bag that the officers seized him and searched his belongings. Officer McCormick, who conducted the search, states:

> Finally, Agent Mueller and I asked him what he had in his bags, suspecting that he might have a weapon or a bomb.

Based on the way Masel was acting, I thought his bag might have contained explosives ... After Masel *refused to* respond to our inquiries as to what he had in his bags, I pulled the bags forcefully from him and put them on the ground as if they contained explosives. While Mueller restrained Masel from fleeing, I opened the bag ...

McCormick Aff. ¶ 11–12.

Officer Mueller adds that he personally became nervous when Masel "refused to answer [their inquiries about his bags] and started to go into his shoulder bag." Apparently he thought "Masel might be going into his bag for a weapon." Mueller Aff. ¶ 12–13.

I cannot conclude on these facts—namely, that Masel "clutched" his bags or refused to answer inquiries about his shoulder bags or reached for them when asked what they contained—that the officers had an objective, reasonable, "particularized" suspicion that Masel was armed and presently dangerous.

■ But even assuming *arguendo* that the officers had reasonable grounds to justify a pat-down search, the nature of the search conducted by officer McCormick was not reasonably limited to its intended purpose. *Sibron*, 392 U.S. at 65, 88 S.Ct. at 1904. Under the circumstances, it was unreasonable for McCormick to reach into the shoulder bags and conduct a full-scale search of Masel's belongings when a limited pat-down would have defused the situation entirely.

The initial scope of a *Terry* search is limited to a pat-down search for weapons. The Court emphasized in *Terry* that the "frisk" must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."

---

1. *United States v. Cole*, 628 F.2d 897, 899 (5th Cir.1980), *cert. den.*, 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981) (mere arrival and presence of someone at a site where a search warrant is about to be executed does not, in itself, raise reasonable suspicion justifying a pat-down search); *United States v. Wheeler*, 800 F.2d 100, 103 (7th Cir.1986) ("simply because someone is in the company of others who themselves are suspected of criminal activity does not alone give rise to a *Terry* stop and frisk justification"); *United States v. Flett*, 806 F.2d 823, 827 (8th Cir.1986) (companions of arrestee in immediate vicinity are not automatically subject to pat-down search).

*Id.* at 29, 88 S.Ct. at 1884. This, of course, is because "[t]he sole justification of the search ... is the protection of the police officer and others nearby." *Id.*[2]

In *Sibron v. New York,* the companion case to *Terry v. Ohio,* a law enforcement officer was held to have exceeded the scope of a *Terry* search when he made "no attempt at an initial limited exploration for arms" but instead "thrust his hand into Sibron's pocket and took from him envelopes of heroin." *Sibron,* 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968). The Court noted that "[t]he search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id.; see also United States v. Romero,* 692 F.2d 699, 703 (10th Cir.1982) (officer "transgressed the permissible limits of a *Terry* pat-down search for weapons" where officer felt stiff object while patting-down individual, did not suspect it was a weapon, but nevertheless reached in pocket and pulled out small bag of marijuana).

The rule in the Second Circuit is no different. "A police officer may forcibly stop a suspect, and promptly conduct a superficial pat-down for weapons if in the light of his experience he reasonably perceives the threat of harm in a given factual situation." *United States v. Del Toro,* 464 F.2d 520, 521 (2d Cir.1972). In *Del Toro,* a police officer conducted a cursory frisk of the companion—and suspected armed bodyguard—of a known narcotics dealer. When he felt a small, creased object in his handkerchief pocket, he removed the object fearing the presence of a knife or razor blade. The object turned out to be a folded ten dollar bill containing a small amount of cocaine. *Del Toro,* 464 F.2d at 521. The Second Circuit suppressed this evidence, holding that, although the cursory frisk for weapons may have been justified, "as a matter of law a ten dollar bill folded to a size of 2″ × ¾″ and containing 2.2 grams of cocaine felt in the handkerchief pocket of [the defendant's] suit coat could not reasonably have aroused the suspicion of a weapon." *Id.; see also United States v. Vasquez,* 638 F.2d 507, 520–21 (2d Cir. 1980), *cert. den.,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981) ("if a weapon is feared, a 'pat-down' may suffice, and make unreasonable an actual search of the individual's pockets").

The same limitations on the scope of *Terry* searches apply to protective searches that extend beyond the person of the individual to the contents of any bags carried by that individual. *See United States v. Ruiz–Estrella,* 481 F.2d 723, 729 (2d Cir. 1973) ("we would require 'similar compelling circumstances' to justify the opening and examination of a passenger's bag"); *United States v. Vaughan,* 718 F.2d 332, 335 (9th Cir.1983) (pat-down of soft briefcase would have complied with *Terry* because weapon could have been detected without opening briefcase, but any search beyond that was unwarranted).[3] To be sure, in limited circumstances, a full search of a bag, without a preceding pat-down, has been held to satisfy *Terry;* however,

---

**2.** *See also Dunaway v. New York,* 442 U.S. 200, 209–10, 99 S.Ct. 2248, 2254–55, 60 L.Ed.2d 824 (1979) ("the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous that probable cause, but only for the purpose of a pat-down for weapons"); *Pennsylvania v. Mimms,* 434 U.S. 106, 112, 98 S.Ct. 330, 334, 54 L.Ed.2d 331 (1977) ("[i]n these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat-down' ").

**3.** *See, e.g., United States v. Walker,* 576 F.2d 253, 255 (9th Cir.1978), *cert. den.,* 439 U.S. 1081, 99 S.Ct. 865, 59 L.Ed.2d 51 (1979) (search of purse satisfied *Terry* where "one of the agents took

[the purse] to feel for weapons ... [and d]etecting several large, hard objects in the purse, he opened it to investigate further for weapons"); *United States v. Johnson,* 637 F.2d 532, 534–35 (8th Cir.1980) (search of duffle bag satisfied *Terry* where officer first grabbed hold of a cloth-covered object protruding from the top of the duffle bag believing it was a shotgun and concluded he was in fact holding the stock of a sawed-off shotgun). *Cf. United States v. Morales,* 549 F.Supp. 217, 221 and 224 (S.D.N.Y. 1982) (agent did not exceed limits of *Terry* search where he opened duffle bag after the bag had struck his arm and he had felt a hard object inside the bag).

those situations have always been attended with extraordinary circumstances.[4]

The touchstone of Fourth Amendment analysis is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878–79; *Pennsylvania v. Mimms*, 434 U.S. 106, 109–10, 98 S.Ct. 330, 332–33, 54 L.Ed.2d 331 (1977). I conclude on the facts at bar that the full search of Masel's shoulder bag was not reasonable. Officer McCormick could easily have allayed his fear that Masel was carrying a concealed weapon or explosives by "patting-down" the soft shoulder bags. A traditional pat-down would have served the officer's purpose while protecting Masel's legitimate expectation of privacy. As the Second Circuit noted in *Del Toro*, "the limited intrusion of a pat-down would promptly defuse what officers experienced in narcotics enforcement perceived as a potentially explosive situation." 464 F.2d at 521. The full search of Masel's bags in public view on a New York City street—when there was no danger that Masel could even reach the two bags that had been forcefully removed from his shoulders—clearly falls outside the limits of reasonableness. Accordingly, I must conclude that the money was illegally seized.

The government argues that "[e]ven if the Court determines that the money was illegally seized, the forfeiture action is not barred." Government's Memorandum at page 27 n. " * ". That statement is not entirely correct. While it is true that the illegal seizure does not bar the forfeiture action, it is equally true that illegally seized evidence must be excluded from these proceedings unless their seizure could be sup-

ported by untainted evidence. As the Fifth Circuit stated in the case of a seized vehicle:

> even if the seizure was illegal, it would not bar the government's right to claim the vehicle through forfeiture proceedings. Improper seizure does not jeopardize the government's right to secure forfeiture if the probable cause to seize the vehicle can be supported with untainted evidence ... [A]n object illegally seized cannot in any way be used either as evidence or as the basis for jurisdiction. Therefore, evidence derived from a search in violation of the fourth amendment must be excluded at a forfeiture proceeding.

*United States v. One 1978 Mercedes Benz, 4–Door Sedan*, 711 F.2d 1297 (5th Cir.1983) (*quoted in United States v. Monkey*, 725 F.2d 1007, 1012 (5th Cir.1984)).

In the case at bar, there is no untainted evidence to support probable cause for a search of Masel's bags. Therefore, the evidence found in his bag—the ten seeds and the money—must be excluded and the forfeiture action dismissed.

### Conclusion

Plaintiff's motion to dismiss is granted. The Clerk of the Court is directed to dismiss the complaint with prejudice. The government is directed to turn the *res* and any accrued interest over to the claimant, Bennett Masel, no later than five (5) days after the time for filing an appeal of this decision has expired.

It is SO ORDERED.

---

4. *See, e.g., United States v. Poms*, 484 F.2d 919, 920–22 (4th Cir.1973) (full search of shoulder bag was reasonable where "the officer had received information from a reliable informant that Poms *always* carried a weapon in his shoulder bag ... [and] provided an accurate description of the bag's appearance and color") (emphasis in original); *United States v. Barlin*, 686 F.2d 81, 86–87 (2d Cir.1982) (full search of pocketbook reasonable where agents had just found heroin, two shotguns and ammunition in apartment, agents did not have handcuffs to neutralize suspects and they needed to finish legal

search of apartment). These cases follow a similar exception to the body-search rule— namely, that body searches should commence with a superficial pat-down or "frisk"—carved out in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In *Adams*, the police officer reached immediately into the suspect's clothing and removed a loaded handgun from the suspect's waistband. This full search passed constitutional muster because a reliable informant had indicated the exact location of the loaded pistol.