**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**BANCO CAFETERO PANAMA, Banco
Cafetero Colon,
Defendants-in-rem-Appellants.**

**No. 948, Dockets 85–6405, 85–6407.**

United States Court of Appeals,
Second Circuit.

Argued April 4, 1986.
Decided Aug. 4, 1986.

---

Scott G. Campbell, New York City (Arnold S. Klein, Kelley Drye & Warren, New York City, on brief), for defendants-in-rem-appellants.

Robert L. Ullmann, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Cynthia L. Keeffe, Jane E. Booth, Asst. U.S. Attys., New York City, on brief), for plaintiff-appellee.

Before LUMBARD, OAKES and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal concerns the Government's attempt to forfeit approximately $3 million in five bank accounts as "proceeds traceable" to narcotics transactions. 21 U.S.C. § 881(a)(6) (1982). Pursuant to 28 U.S.C. § 1292(b) (1982), Banco Cafetero Panama ("BC Panama") and it branch office, Banco Cafetero Colon ("BC Colon"), appeal from an interlocutory order of the District Court for the Southern District of New York (Gerard L. Goettel, Judge) denying a motion to vacate *in rem* warrants lodged against their bank accounts in forfeiture proceedings. The controlling questions of law framed by the District Court in certifying its ruling for appeal ask whether, under the circumstances of this case, a bank's account at a correspondent bank is forfeitable as proceeds of a drug transaction and whether due process of law requires a probable cause hearing immediately after the initiation of forfeiture proceedings. For reasons that follow, we answer the first question in the affirmative and the second in the negative, as did the District Court. We therefore affirm the District Court's order.

Before turning to the facts and legal issues, we need to make a brief clarification concerning the nature of the appeal. Section 1292(b) permits an interlocutory appeal to be taken, with the approval of a court of appeals, from an "order" of a district court when a district court determines that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion"

and that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." Though it is helpful for a district court to frame the controlling questions of law that the order involves, as Judge Goettel did in this case, the statutory procedure specifies appeal of the order, rather than certification of the questions,[1] as the parties to this appeal appear to believe.

## I. Background

The Government alleges that it has probable cause to believe that the funds at issue ultimately derive from the drug dealings of a criminal conspiracy led by Gilberto Rodriguez-Orejuela, President of First Interamericas Bank ("FIB").[2] The Rodriguez group allegedly operated a massive drug business in the United States and deposited the proceeds of this business in FIB accounts. Between August 1983 and March 1985, when the Panama National Banking Commission closed FIB, some $46 million were transferred by FIB into an account that BC Panama maintained at the Irving Trust Company ("Irving Trust") in New York City. Millions of dollars were subsequently transferred from this BC Panama account into accounts maintained by BC Panama at four other banks and into one account maintained by BC Colon at Irving Trust.

On March 8, 1985, the Government filed five complaints seeking forfeiture of the accounts of BC Panama and BC Colon at Irving Trust and of BC Panama's accounts at the four other banks.[3] Because one of these accounts has a negative balance, the Government's claim against it has become moot.[4] The Government represents that approximately $3 million remain in the other five accounts.

Upon the filing of the complaints, *in rem* warrants were issued for the arrest of the bank accounts pursuant to 21 U.S.C. § 881(b) and Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims. The Government executed the warrants, and the banks at which BC Panama and BC Colon had accounts immediately froze them. On March 13, 1985, appellants moved the District Court for an order vacating the *in rem* warrants. Appellants argued, among other things, that the accounts did not constitute a forfeitable *res* under 21 U.S.C. § 881(a)(6) and that failure to conduct an immediate probable cause hearing would constitute a denial of due process. The District Court rejected appellants' arguments and declined to vacate the warrants. *See United States v. Banco Cafetero International*, 608 F.Supp. 1394 (S.D.N.Y.1985). The District Court granted appellants' motion to certify its ruling for interlocutory appeal, *see United States v. Banco Cafetero International*, 107 F.R.D. 361 (S.D.N.Y.1985), and this Court accepted the appeal.

## II. Traceable Proceeds

These forfeiture actions were brought pursuant to 21 U.S.C. § 881, which provides in pertinent part:

---

1. The section 1292(b) procedure is to be contrasted with the procedure under 28 U.S.C. § 1254(3) (1982) permitting a court of appeals to certify a question of law to the Supreme Court, in which event the Supreme Court "may give binding instructions or require the entire record to be sent up for decision of the entire matter in controversy." *See also* Rule 16 of the General Rules of the Temporary Emergency Court of Appeals (TECA), authorizing a district court, in cases within the jurisdiction of the TECA, to certify to the TECA a question involving a substantial constitutional issue.

2. Much of the Government's basis for its beliefs regarding the activities of Rodriguez and FIB remains secret. The Government asserts that such information must remain confidential pending Rodriguez's extradition from Spain and his trials in the Eastern District of New York and the Central District of California.

3. The Government sought forfeiture of BC Panama's accounts with Chemical Bank, Philadelphia International Bank, Marine Midland Bank, and First Chicago Bank.

4. BC Panama's account with Philadelphia International Bank is the account with a negative balance.

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

.    .    .    .    .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

Appellants contend that, even if the Government's factual allegations regarding the Rodriguez conspiracy are true, the five seized accounts may not be considered "proceeds traceable" to narcotics exchanges within the meaning of section 881(a)(6).

■ Appellants rely on the realities of banking practice and the law that has developed as a result. When a customer deposits funds into a bank account, his bank credits the account in an amount equal to the deposit. At any given moment, the credit balance of an account is the cumulative result of all transactions affecting the account. Banks are not bailees of their depositors' money, and a depositor may not replevy his money as a specific *res* or follow it into the hands of another bank customer, *see Holly v. Missionary Society of the Protestant Episcopal Church*, 180 U.S. 284, 293–94, 21 S.Ct. 395, 398, 45 L.Ed. 531 (1901); *Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 560 (2d Cir.1976); *New York State Association of Life Underwriters v. Superintendent of Insurance*, 37 A.D.2d 304, 307, 325 N.Y.S.2d 172, 175–76 (3d Dep't 1971), *aff'd*, 30 N.Y.2d 746, 284 N.E.2d 157, 333 N.Y.S.2d 173 (1972); *In re*

*Rubinstein's Estate*, 169 Misc. 273, 275, 7 N.Y.S.2d 311, 314–15 (Sur.Ct.1938).

Appellants argue that these principles govern the instant controversy and that their bank accounts are therefore insulated from forfeiture. Their argument rests primarily on the fungibility of money and on the burdens of investigation that they claim will be imposed upon banks if the Government's forfeiture theory is deemed legally valid. In considering the Government's claim for forfeiture and the appellants' objections to it, it will be helpful to keep in mind three distinct contexts in which there will arise the question whether a credit balance in a bank account is "proceeds traceable to [a narcotics] exchange" within the meaning of section 881(a)(6).

■ A. *Account Used Solely for Drug Proceeds.* The first context is the straightforward situation where a seller of narcotics opens a bank account and deposits into the account only money received from drug sales. The deposited money has been exchanged for a credit. This credit is clearly "traceable proceeds" under the forfeiture statute. The statute covers any asset exchanged directly for narcotics, such as a bar of gold or a car. Congress has also made it clear that "traceable proceeds" includes an asset indirectly exchanged for narcotics in one or more "intervening legitimate transactions, or otherwise changed in form...." *See* Joint Explanatory Statement of Titles II and III, Psychotropic Substances Act of 1978, Pub.L. No. 95–633, *reprinted in* 1978 U.S.Code Cong. & Ad. News 9518, 9522 ("Explanatory Statement"). If the seller of drugs uses the cash he receives to buy a bar of gold or a car, that asset is "traceable proceeds," and so is a credit at a bank. Though emphasizing the fungibility of money, even the appellants grudgingly acknowledge that the credit resulting from a deposit of drug money "may arguably constitute 'traceable proceeds.'" Brief for Appellants at 20.

■ B. *Account Used for Drug Proceeds and Other Transactions.* The second and more problematic context arises where the account of the narcotics seller is

not devoted solely to deposits from drug sales but is a general purpose account into which funds from legitimate transactions are also deposited and from which money is withdrawn. As to this context, appellants contend that the fungibility of money makes it impossible to consider any portion of the depositor's credit balance to be "traceable proceeds" because the credit balance does not represent just the proceeds of drug sales but is instead the net result of various deposits and withdrawals. Though this context presents some accounting choices, shortly to be considered, we think it clear that Congress intended the forfeiture statute to apply to a credit balance reflecting the cumulative results of deposits into and withdrawals from an account into which were deposited proceeds from drug sales. The legislative history that discussed "intervening" transactions explicitly recognized that the forfeiture statute could reach proceeds "commingled" with other assets:

> [I]f such proceeds were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture, but only to the extent that it could be shown that a traceable connection to an illegal transaction in controlled substances existed.

Explanatory Statement at 9522.

This statement is clear enough about commingling, but it offers no help in determining under what circumstances a "traceable connection" exists between a drug sale and a credit balance of an active account into which some drug sale proceeds were deposited. That problem requires consideration of accounting. Three basic approaches appear to be possible. If $100 from a drug sale is deposited into an active account, one approach is to consider the account to be "traceable proceeds" to the extent of $100 as long as the account balance never falls below that sum.[5] This

might be called a "drugs-in, last-out" rule. This approach, more properly called the "lowest intermediate balance" rule, is used to determine the rights of a trust beneficiary to a trustee's bank account in which trust funds and the trustee's personal funds have been commingled. *See Restatement (Second) of Trusts* § 202(1) comment j (1959). This method is also used in the area of secured transactions to trace proceeds of the sale of collateral in commingled funds in the hands of a debtor or to a debtor's transferee not in the ordinary course of business. *See Brown & Williamson Tobacco Corp. v. First National Bank,* 504 F.2d 998 (7th Cir.1974); *Universal C.I.T. Credit Corp. v. Farmers Bank,* 358 F.Supp. 317 (E.D.Mo.1973). A second approach is to consider "traceable proceeds" to be a pro rata share of any withdrawal from the account or of any asset purchased with such withdrawal, the share determined by the ratio of the $100 tainted deposit to the funds in the account immediately after the deposit. This option of an "averaging" rule, as an alternative to the "lowest intermediate balance" rule, is used to resolve tracing problems where withdrawals are made from an account in which trust and personal funds have been commingled. *See Restatement (Second) of Trusts, supra,* § 202(1) comment i. A third approach is to consider "traceable proceeds" to be any one withdrawal, or any asset purchased with such withdrawal, to the extent of $100. This might be called a "drugs-in, first-out" rule. The Government contends that it is entitled to the benefit, at its option, of either the first or third approach.[6]

■ We conclude that the Government's position is sufficiently correct to enable it to prevail on this appeal. Where the credit in a depositor's account represents the net results of transactions that include a deposit of drug money, there is a plausible argument to be made *either* that the account

---

**5.** Under this approach, untainted money added to the account after the balance has fallen below the amount of the tainted proceeds is immune from seizure.

**6.** Since the Government makes no claim to an "averaging" approach to tracing, we need not consider whether that approach is also an available option.

contains the "traceable proceeds" of the tainted deposit (so long as the balance has not fallen below the amount of the tainted deposit) *or* that any withdrawal (in excess of the tainted deposit) contains the "traceable proceeds" of such a deposit. Which approach reflects reality in any particular case will depend on the precise circumstances. For example, if a depositor placed a $175 check from his automobile insurer in payment of a damage claim into an account that contained $100 from a drug sale and the next day paid a $175 bill for car repairs, a fact-finder would be entitled to conclude that the $175 withdrawal did not contain "traceable proceeds" of the drug transaction but solely the "traceable proceeds" of the insurance payment, with the tainted deposit remaining in the account. Obviously few cases will present facts that neatly match untainted deposits with withdrawals, and the real question therefore becomes which side bears the risk of the inevitable uncertainty that will arise in most cases. Congress has answered that question in the Government's favor by assigning it a lenient burden of proof in obtaining forfeiture of "traceable proceeds" of drug transactions.

■ To establish a prima facie case for forfeiture of drug proceeds, the Government need only demonstrate probable cause for a forfeiture. *See* 21 U.S.C. § 881(d) (1982) (incorporating the procedures for customs forfeitures); 19 U.S.C. § 1615 (1982). To satisfy the probable cause requirement, the Government must have reasonable grounds to believe that certain property is subject to forfeiture. These grounds must rise above the level of mere suspicion but need not amount to what has been termed "prima facie

proof." [7] *See United States v. $93,685.61*, 730 F.2d 571, 572 (9th Cir.) (per curiam), *cert. denied, Willis v. U.S.*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 61 (1984); *United States v. "Monkey,"* 725 F.2d 1007, 1010 (5th Cir.1984); *United States v. $22,287*, 709 F.2d 442, 446–47 (6th Cir.1983). The Government must have probable cause to connect the property with narcotics activity, *see United States v. $4,255,625.39*, 762 F.2d 895, 903 (11th Cir.1985) ("*SONAL*"), *cert. denied,* —— U.S. ——, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986); *United States v. $22,-287, supra,* 709 F.2d at 447; *United States v. $364,960*, 661 F.2d 319, 323 (5th Cir. 1981), but need not link the property to a particular transaction, *see SONAL, supra,* 762 F.2d at 904; *United States v. Brock*, 747 F.2d 761, 762–63 (D.C.Cir.1984) (per curiam). If the Government satisfies the probable cause requirement, the claimant bears the ultimate burden of proving that the factual predicates for forfeiture have not been met. *See* 19 U.S.C. § 1615.

■ Congress's allocation of the burden of proof in drug proceeds forfeiture cases persuades us that the Government is correct in its view that it can establish a prima facie case for forfeiture in the context of bank accounts by relying on either the "drugs-in, last-out" approach or the "drugs-in, first-out" approach. In almost all cases, once the Government has shown probable cause to believe that a person has sold drugs and has deposited the proceeds of a drug sale into a bank account, there will be probable cause to believe that the bank account contains "traceable proceeds" of the sale (if the balance has not fallen below the amount of the deposit) *and* probable cause to believe that a withdrawal contains such "traceable proceeds" (if the

7. The term "prima facie proof," though repeatedly used in forfeiture cases to describe the quantum of evidence that the Government need *not* present, is a somewhat unfortunate formulation. "Prima facie proof" in most cases means the quantum of evidence that permits a plaintiff to prevail before a fact-finder. Since the forfeiture statute permits the Government to prevail upon a showing of probable cause, evidence establishing probable cause *is* "prima facie proof" in a forfeiture action. Presumably,

courts stating that the Government need not present "prima facie proof" to prevail in a forfeiture proceeding mean that the evidence need not meet the standard of proof known as preponderance of the evidence, *i.e.,* that the fact to be proved is more likely so than not so. The "prima facie proof" formulation, as a standard the Government need not meet in forfeiture cases, appears to derive from Chief Justice Marshall's opinion in *Locke v. United States,* 7 Cranch (11 U.S.) 339, 348, 3 L.Ed. 364 (1813).

withdrawal exceeds the deposit). The burden will then be on the claimant to demonstrate that no portions of the account or no portions of the withdrawal, depending on which the Government pursues, are "traceable proceeds" of the drug sale. No doubt uncertainty caused by the fungibility of money will make it difficult and in many cases impossible for claimants to satisfy this burden. But it is precisely the function of burden of proof rules to determine which party loses where evidence is lacking or at best ambiguous. Under the Congressional scheme, the risk of uncertainty in determining the traceability of proceeds of drug sales is placed squarely on the claimant, once probable cause has been established. It would be inconsistent with this scheme to immunize from seizure bank accounts or withdrawn funds as to which probable cause exists to believe they are "traceable proceeds" of drug transactions.

C. *Account Funded at Another Bank with Drug Proceeds.* The third context occurs where a bank at which a depositor's credit balance includes "traceable proceeds" of a drug transaction moves funds into its account at a second bank or, as allegedly occurred in this case, into the second bank's account at a third bank. FIB allegedly moved its forfeitable funds into BC Panama's account at Irving Trust. When FIB made these deposits, Irving Trust credited BC Panama's account and BC Panama credited FIB's account.[8] This transaction is functionally identical to a deposit by FIB into its own account with BC Panama and a transfer by BC Panama into its account at Irving Trust.

■ We see no reason why the statutory framework, including the burden of proof rules and the innocent owner defense, should apply any differently in this context than in the simpler context of a drug seller making deposits into his account at his own bank. Congress wished to reach proceeds of drug transactions exchanged through a series of "intervening" transactions and "changed in form." When the drug seller's bank receives his cash proceeds from a drug sale in exchange for a credit in favor of the drug seller, the cash received is still "traceable proceeds" of a drug sale, notwithstanding the fact that the drug seller's credit balance in his account is also "traceable proceeds." Without deciding whether the Government is entitled to forfeit both the cash from the bank and the credit balance from the depositor, *cf. SONAL, supra,* 762 F.2d at 905 (suggesting that cumulative forfeitures are permissible),[9] we agree with the Government that either is vulnerable to forfeiture. The cash in the hands of the bank does not cease to be "traceable proceeds" just because it is commingled with the bank's other cash.[10] Since commingled assets, traceable to drug proceeds, are forfeitable, the bank's money remains vulnerable to forfeiture when the money is moved into its account at a second bank or into a second bank's account at a third bank. The credit balance in the bank's account at the second bank or the credit balance of the second bank's account at the third bank are assets exchanged for

**8.** In this case, BC Panama's credits to its customers are located in Panama, beyond the *in rem* jurisdiction of United States courts. As a result, the Government has looked to the accounts of BC Panama and BC Colon in this country to recover the drug proceeds of the Rodriguez group.

**9.** There is a plausible argument, as *SONAL* suggests, for cumulative forfeiture of all assets *exchanged* for drugs or drug proceeds. For example, if $100 from the sale of drugs is exchanged for a watch, both the $100 in the hands of the watch seller and the watch in the hands of the drug seller are vulnerable to forfeiture as traceable proceeds, and the Government may well be entitled to forfeit both. However, cumulative forfeiture is not permissible simply because available accounting rules afford the Government more than one route in tracing forfeitable proceeds. For example, if $100 from the sale of drugs is deposited in an account funded with untainted money, $100 in the account and each $100 withdrawal are all vulnerable to forfeiture, but the Government can obtain only a single forfeiture of $100.

**10.** If the drug seller used $100 from a drug sale to buy a watch from a jeweler who knew the source of the $100, the $100 would not be immune to forfeiture just because it was commingled with other cash in the jeweler's cash register.

proceeds of a drug transaction, just like the credit balance in the drug seller's account in the bank where the initial deposit was made.

Nothing in the terms or legislative history of the forfeiture statute gives the slightest reason to believe that Congress wished to accord banks any special insulation from vulnerability to forfeiture of assets traceable to drug proceeds. On the contrary, Congressional concern with money laundering points in precisely the opposite direction.

Appellants contend that a broad application of the forfeiture statute to bank accounts will wreak havoc in the banking industry. They argue that banks will accept deposits at their peril, since investigation of the sources of customers' deposits would be costly, time-consuming, and often unilluminating. The risk is vastly overstated. A bank has no duty to investigate the source of its customers' deposits. It acts at its peril only when, as a passive receiver of knowledge, it learns that a deposit is derived from drug profits and nevertheless accepts that deposit. The statute imposes no investigatory costs on the banking system.

■ Moreover, as the Government conceded at argument, the bank's knowledge, for purposes of the innocent owner defense, is not the cumulative knowledge of all the bank's employees. For a bank to be vulnerable to forfeiture of its cash, the fact that particular funds are immediate or traceable drug proceeds and the fact that those funds have been deposited at the bank must be known to the same employee of that bank. As a result, banks need not engage in costly internal control procedures to ensure that one employee does not accept funds for deposit that another employee, who is unaware of the deposit,

knows to be tainted. We need not decide on this appeal what level of authority the employee with knowledge of both taint and deposit must occupy to render forfeitable cash or accounts of a bank. *Cf.* Model Penal Code § 2.07(1)(c), (4)(c) (1974) ("high managerial agent").

■ Applying the statute to the facts alleged in this case, we agree with the District Court that the BC Panama account at Irving Trust is vulnerable to forfeiture, as are the accounts into which funds from that account were transferred. Whether the Government can establish probable cause to believe the accounts are traceable proceeds of narcotics transactions and, if so, whether the claimants can sustain their burden of proof to establish either that the accounts are not forfeitable or that the claimants are entitled to the innocent owner defense are matters to be determined at trial. We answer the District Court's first question in the affirmative,[11] and agree that the arrest warrants were not dismissable as a matter of law.

## III. Due Process

Under the drug forfeiture statute, the Government may seize property upon the filing of a complaint and need not demonstrate probable cause until the forfeiture trial. *See* 21 U.S.C. § 881(b); *United States v. One 1978 Mercedes Benz*, 711 F.2d 1297, 1302 (5th Cir.1983). Appellants concede that they are not entitled to a pre-seizure probable cause determination. *See United States v. $8,850*, 461 U.S. 555, 562 n. 12, 103 S.Ct. 2005, 2011 n. 12, 76 L.Ed.2d 143 (1983); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 678–80, 94 S.Ct. 2080, 2089–90, 40 L.Ed.2d 452 (1974). They contend, however, that the Due Process Clause of the Fifth Amendment requires an immediate post-seizure

---

11. The question, as worded by the District Court, asks:

[W]here a customer of a claimant bank has previously deposited money into a demand account maintained by the claimant bank with a correspondent bank, and the Government alleges the customer funded the prior deposit with the proceeds of illicit transac-

tions forfeitable under 21 U.S.C. § 881, can the Government seek to forfeit a subsequent credit balance in the claimant bank's account with its correspondent in lieu of the credit which the customer received when it made the previous deposit.

107 F.R.D. at 364.

probable cause hearing in advance of the forfeiture trial.

In *United States v. $8,850, supra*, the Supreme Court held that due process requires the Government to commence a forfeiture action within a reasonable time of seizure. To determine reasonableness, the Court applied the four-factor test developed in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in the speedy trial context and examined the length of delay, the reason for delay, the claimant's assertion of his right to a prompt adjudication, and prejudice to the claimant. *See United States v. $8,850, supra*, 461 U.S. at 564, 103 S.Ct. at 2012. Under the circumstances of that case, the Court held that a delay of eighteen months in the filing of a forfeiture action was justified, in part, by the need to process related criminal proceedings.

▮▮▮▮ Because the Government filed complaints in these forfeiture actions prior to seizure, the Government has clearly commenced its forfeiture actions without undue delay. The Government argues that it is entitled to delay trial of the forfeiture actions pending Rodriguez's extradition from Spain and his trials in the Eastern District of New York and the Central District of California. Since a substantial delay in commencing forfeiture proceedings was justified by the need to prepare related criminal matters in *United States v. $8,850, supra*, some delay for similar reasons once a forfeiture action is filed also comports with due process. Therefore, we hold that appellants are not entitled to an immediate probable cause hearing in advance of the forfeiture trial,[12] and answer the District Court's second question in the negative.[13]

▮▮▮ However, we do not agree with the Government's contention that due process is fully satisfied merely by the commencement of forfeiture proceedings within a reasonable time after seizure or, as here, prior to seizure. The Government argues that, once an action is filed, delays of any length may be granted to allow completion of related criminal proceedings. To require prompt filing of a forfeiture action but allow indefinite postponement of the trial would reduce the filing requirement to a nullity. Under the *Barker* test, which we think applies to the holding of the forfeiture trial as well as to the filing of the action, there is a due process violation at some point. Of course, the District Court need not delay the holding of a forfeiture trial for the maximum period allowed by due process. In any event, we need not determine on this appeal at what point a due process violation occurs. We leave to the District Court the task of conducting a forfeiture trial within a reasonable time, in accordance with the *Barker* factors, to provide appellants with due process of law.

## IV. Conclusion

We answer the District Court's first question in the affirmative and the second

---

12. *Lee v. Thornton*, 538 F.2d 27 (2d Cir.1976), relied upon by appellants, is not to the contrary. In *Lee*, we held that owners of vehicles seized at the border and subject to summary forfeiture were entitled to a probable cause hearing within seventy-two hours of seizure. However, we did not require this probable cause hearing in advance of and in addition to a judicial determination of probable cause. We required the probable cause hearing as a substitute for judicial proceedings. *See United States v. One 1971 BMW 4–Door Sedan*, 652 F.2d 817, 820 (9th Cir.1981). Although the claimant in *Lee* could have received a judicial determination upon posting a $250 bond, we recognized that the bond requirement was an insuperable obstacle to the claimant in that case and to many other claimants. *See Lee v. Thornton, supra*, 538 F.2d at 32.

13. The question, as worded by the District Court, asks:

[W]hether, where the Government commenced, pursuant to 21 U.S.C. § 881, civil forfeiture proceedings and contemporaneously seized millions of dollars credited to the checking accounts of several banks, the failure to provide those banks with an immediate post-seizure evidentiary hearing and determination whether the Government had probable cause to seize and retain that property, deprived the banks of that property without due process of law under the Fifth Amendment to the U.S. Constitution.

107 F.R.D. at 364.

in the negative. The order of the District Court is affirmed.