UNITED STATES of America, Plaintiff,

v.

**ONE SINGLE FAMILY RESIDENCE LOCATED AT 6960 MIRAFLORES AVENUE, CORAL GABLES, FLORIDA, Also Known As Lot 10, in Block 14, of Cocoplum Section 2 Plat "B", According to the Plat Thereof, as Recorded in Plat Book 115, at Page 84 of the Public Records of Dade County, Florida, Together With All Buildings, Fixtures and Appurtenances Thereto and All Improvements Thereon, Defendant.**

No. 88–0349–CIV.

United States District Court,
S.D. Florida.

Feb. 21, 1990.

Stanley Beiley, Miami, Fla., for defendant Republic Nat. Bank.

Alan Dagen, Asst. U.S. Atty., Miami, Fla., for U.S.

## MEMORANDUM OPINION

SCOTT, District Judge.

This controversy presents serious issues involving the civil forfeiture law, 21 U.S.C. § 881, and its impact upon lending institutions. It brings into play the duties and obligations of a commercial lending institution when unmistakable "red flags" have been raised as to the involvement of drug-related proceeds in a financial transaction. Concomitantly, it presents to the Court the duty to define the standard of conduct for lending institutions in such cases. We venture forward fully cognizant of this opinion's precedent-setting nature.

### I. HISTORY OF THE CASE

The United States brings this *in rem* action[1] for forfeiture of real property located at 6960 Miraflores Avenue, Coral Ga-

---

1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1355 and 2461.

bles, Florida.[2] The Government alleges that Indalecio Iglesias was the true owner of the property and that he has engaged in a continuing series of narcotics-related transactions in violation of 21 U.S.C. §§ 841(a)(1) and 846, resulting in over 100 million dollars in illegal proceeds. The Government further alleges that Iglesias used these illegal proceeds to purchase the defendant real property.

Thule Holding Corporation ("Thule"), a Panamanian corporation, filed its claim and answer as the record owner of the property. Initially, Thule alleged that it had no knowledge of any illegal activities related to the real property. However, shortly before trial, Thule executed a stipulation of settlement and consent to forfeiture.

Republic National Bank of Miami ("Republic") filed its claim and answer asserting an $800,000.00 lien interest in the real property pursuant to a mortgage and security agreement recorded September 30, 1987. The issues between Republic and the Government were tried to the Court on June 27 and 28, 1988. The questions litigated included probable cause, relation back and innocent ownership.

Following submission of the case, the Government moved to reopen the evidence, claiming that a previously undisclosed witness had critical evidence. After initially opposing the motion, Republic withdrew its opposition, provided that it could offer appropriate rebuttal evidence. That request was honored.

In October 1988, the trial resumed with the Government's witness, Rene J. Leonard, followed by a number of Republic's witnesses attacking Leonard's credibility and, thereafter, the Government's efforts to bolster his credibility. In light of the issues involved, the parties were provided ample opportunities to brief the multiple issues and they responded accordingly. Those memoranda have been quite helpful and counsel are commended. Our findings of fact and conclusions of law follow.[3]

## II.  PROBABLE CAUSE

### A.  *Factual Background*

### 1.  *Iglesias' Drug–Trafficking Activities*

■  The Government called Drug Enforcement Administration ("DEA") Special Agent Lee Truesdale to establish probable cause.[4] Truesdale testified about his investigation of Indalecio "Andy" Iglesias, based on intelligence gathered through conversations with the Federal Bureau of Investigation ("FBI"), Internal Revenue Service ("IRS") and Customs Service ("Customs").[5]

Special Agent Truesdale testified that, on December 10, 1980, Iglesias was arrested on board a vessel stopped by Customs in which 300 pounds of marijuana were found in a sealed compartment. In April 1981, Iglesias was arrested for possession of 3,000 pounds of marijuana and fined $10,000.00 by Bahamian officials.

Truesdale also offered evidence obtained through "reliable" confidential informants. These informants possessed first-hand knowledge of Iglesias's drug importation activities. The informants were involved in smuggling both marijuana and cocaine with Iglesias.

Through an informant, Iglesias began to import cocaine from Colombia into the United States. The informant estimated that Iglesias transported approximately 30,000 kilograms of cocaine between 1980

---

2.  Pursuant to stipulation between the parties, with Court approval, the property was sold for $1,050,000 on June 1, 1988. The funds are being held by the United States Marshal pending disposition of this case.

3.  Fed.R.Civ.P. 52(a); *see Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

4.  The government bears the initial burden of establishing probable cause to believe that the property is derived from illegal drug activities.

Once the government has established probable cause, the burden shifts to the claimant, either to rebut the government's evidence or to prove innocent ownership. *United States v. A Single Family Residence*, 803 F.2d 625 (11th Cir.1986).

5.  In a forfeiture proceeding, the government may offer hearsay evidence to establish probable cause. *United States v. A Single Family Residence*, 803 F.2d 625, 629 n. 2 (11th Cir. 1986).

and 1985. Based upon his knowledge, the informant estimated that Iglesias earned 180 million dollars in drug profits between 1980 and 1985. This estimate was based upon Iglesias's charge per kilo ($6,000 to $9,000) for transportation multiplied by the number of kilos (30,000) transported over the five-year period. Iglesias had no legitimate source of income for this time period.

### 2. *Iglesias' Acquisition of Miraflores*

During this period between 1980 and 1985, while Iglesias was importing narcotics from Colombia, he was also purchasing expensive property in South Florida. The defendant property located at 6960 Miraflores Avenue, Coral Gables, Florida, was one such property.

In 1983, acting through Thule, a shell corporation, Iglesias purchased the Miraflores lot and partially-constructed residence. Between 1983 and 1984, through a series of agents and contractors, Iglesias continued construction on the Miraflores property. Iglesias and his wife were present at the site and supervised construction of the residence. Iglesias paid one contractor between $200,000 and $220,000 across this time period. This contractor was paid $7,000 to $9,000 every week or two weeks, in cash, carried in a briefcase. A second contractor was paid approximately $140,000. About 60% of these payments were in cash. After the house was constructed, Iglesias and his family were the only persons ever to reside at Miraflores.

### 3. *Republic's Mortgage Interest*

In August 1987, IRS agents contacted Inocente Hernandez concerning Iglesias. Shortly thereafter, Iglesias called Hernandez to find out whether the IRS had contacted him. Hernandez told Iglesias that the IRS had called to ask questions about Iglesias and the property at Miraflores. Alerted to the investigation, Iglesias immediately began his efforts to recoup his financial investment before possible Government action. Iglesias put the house up for sale and approached Miami lenders to secure a mortgage on the property.

Republic agreed to provide an $800,000 one-year balloon note on the property, which was appraised at $1.2 million. Once the loan was approved, Republic transferred the proceeds to the borrower's Swiss bank account. Iglesias had recently purchased an airplane ticket to Geneva. He has apparently fled the jurisdiction of the United States.

### B. *Legal Analysis*

■ Republic contends that the Government has failed to show any nexus between the property seized and a particular drug deal. However, Republic "misunderstands the government's burden. The government need not trace the cash to specific transactions, or actually prove by a preponderance of evidence a substantial connection to drug dealing." *United States v. $41,305.00 in Currency and Traveler's Checks,* 802 F.2d 1339, 1343 (11th Cir.1986). The Government need only show probable cause to believe that "a substantial connection exists between the property to be forfeited and an illegal exchange of a controlled substance." *United States v. Four Million, Two Hundred and Fifty-Five Thousand Dollars,* 762 F.2d 895, 903 (11th Cir.1985) (citation omitted).

■ The Eleventh Circuit has recently stated the test as follows:

> In demonstrating a substantial connection between the property and illegal drug transactions, the government is not required to show a relationship between the property and a specific drug transaction. The government's burden of demonstrating probable cause is less than prima facie proof but more than mere suspicion.

*United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties,* 893 F.2d 1245 (11th Cir.1990).[6] In addition, probable cause may be based "wholly on circumstantial evidence, and that evidence may include facts learned after the actual seizure of the money."

*Fifty-Five Thousand Dollars,* 762 F.2d at 902 n. 14.

---

**6.** The "substantial connection" requirement is not found in the statute, but rather in the legislative history. *Four Million, Two Hundred and*

*$41,305.00*, 802 F.2d at 1343. Applying these principles, the Court makes the following factual findings on the issue of probable cause:

1. The Miraflores lot, with the residence, was worth $1.2 million dollars.

2. Iglesias purchased the Miraflores property through Thule. Thule was a straw owner for Iglesias.

3. Iglesias paid a series of agents and contractors to build a luxury home on the Miraflores lot. The contractors were paid large sums of money, primarily in cash, in payments under $10,000, to avoid the currency reporting laws.

4. Iglesias and his wife were present at the site and supervised construction of the property. Iglesias and his family are the only persons who ever resided at the property.

5. Iglesias is a known drug-trafficker. He has previously been arrested and convicted on narcotics charges.

6. The Court accepts Special Agent Truesdale's testimony that Iglesias earned 180 million dollars from the illegal importation of narcotics during the relevant timeframe. Truesdale's testimony was based on his own investigation, statements of other investigating agents, and statements of a reliable confidential informant. The informant's statements were, in turn, corroborated by the statements of other informants with personal knowledge.

7. Iglesias had no legitimate source of income during this time.

8. Iglesias knew that he was under investigation by the IRS, and that the Miraflores property was part of this investigation.

9. As soon as Iglesias became aware of the investigation, he put the house up for sale, secured an $800,000 mortgage loan on the property, and sent the money to a Swiss bank account.

The Court finds that probable cause exists to believe that Iglesias bought the Miraflores property and constructed the residence with drug profits, and then laundered the money through the Republic mortgage into his Swiss bank account. We have judged the facts "not with a clinical detachment, but with a common sense view to the realities of normal life." *Wilson v. Attaway*, 757 F.2d 1227, 1235 (11th Cir. 1985). Under this standard, we have also taken "into account, as a 'common experience consideration,' the fact that Miami has become a known center for drug-smuggling and money-laundering." *Four Million, Two Hundred and Fifty–Five Thousand Dollars*, 762 F.2d at 904; *United States v. One 1980 Bertram 58' Motor Yacht*, 876 F.2d 884, 888 n. 4 (11th Cir.1989). Considering the "totality of the circumstances," *Four Parcels of Real Property*, 893 F.2d 1245, we conclude that the Government has met its burden of showing probable cause to forfeit the property.

## III. RELATION BACK

Having established the probable cause requirement, the Government contends that Republic's claim must fail as a matter of law under the relation back doctrine. Under this doctrine, the interest of the United States vests in the property upon commission of the offense giving rise to the forfeiture. 21 U.S.C. § 881(h) (1984 amendment codifying relation back doctrine). A final judgment of forfeiture merely confirms the government's interest and therefore relates back to the time of the offense. Thus, the Government argues that Republic, as a subsequent purchaser, could not have acquired any interest in the property.

The genesis of the Government's position is *United States v. Stowell*, 133 U.S. 1, 10 S.Ct. 244, 33 L.Ed. 555 (1889), decided over one hundred years ago. In *Stowell*, 133 U.S. at 16–17, 10 S.Ct. at 247, the Supreme Court stated that forfeiture of property to the United States relates back to the time of the offense and "avoids all intermediate sales and alienations, even to purchasers in good faith." The forfeiture statute in *Stowell* applied to property owned by a person who "knowingly has suffered or permitted the business of a distiller to be there carried on, or has connived at the same." *Stowell*, 133 U.S. at 2 n. 1, 10 S.Ct. at 244 n. 1. Thus, the Supreme Court in *Stowell*

merely held that "an exception for innocent holders did not prevent forfeiture from relating back in the case of holders who did not qualify for the exception." *Eggleston v. State of Colorado*, 873 F.2d 242, 247 (10th Cir.1989).

Since *Stowell* was decided, Congress has provided an innocent owner exception to most forfeiture statutes, including the civil forfeiture statute, 21 U.S.C. § 881. The innocent owner exception protects "the interest of an owner" who proves that the offense was committed without its "knowledge or consent." 21 U.S.C. § 881(a)(7). The Government contends, however, that the innocent owner provision only applies to claimants who owned the property at the time of the offense, and not to those who acquired the property afterward. To test the validity of this contention, the Court must review the language and legislative history of the innocent owner provision, 21 U.S.C. § 881(a)(7).

### A. *Legislative History*

Section 881(a)(7) provides that "no property shall be forfeited ... to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." The issue is whether the term "owner" includes a claimant who acquired an interest in the property subsequent to the offense leading to forfeiture. The plain meaning of the language employed by Congress is the "primary, and ordinarily the most reliable" source of legislative intent. *Public Citizen v. United States Department of Justice*, —— U.S. ——, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). In this case, however, the meaning of the statute is not clear. Moreover, because "statutes always have some purpose," *id.*, a review of the legislative history can only assist the Court in divining Congressional intent.

Congress enacted the innocent owner exception "in order to protect the individual who obtains ownership of proceeds with no knowledge of the illegal transaction." Congressional Record—Senate, July 27, 1978, p. S23056 (remarks of Senator Cul-

ver). Congress intended "to make it clear that a bona fide party who has no knowledge or consent to the property he owns having been derived from an illegal transaction, that party would be able to establish that fact under this amendment and forfeiture would not occur." *Id.* at S23057 (remarks of Senator Nunn).

Thus, Congress believed that the innocent owner exception would protect bona fide purchasers who acquired ownership of the property subsequent to the offense giving rise to the forfeiture. The Government's position to the contrary is simply not supported by the legislative history of the statute.

### B. *Case Law*

The Eleventh Circuit has not had the opportunity to decide whether the relation back doctrine prevents a bona fide purchaser from acquiring an interest in the property subsequent to the offense. Because the Court of Appeals has never denied the claim of a subsequent bona fide purchaser, the applicability of the innocent owner provision remains an open question.

The Government relies on *United States v. $41,305.00 in Currency and Traveler's Checks*, 802 F.2d 1339, 1346 (11th Cir.1986). However, the court in *$41,305.00* did not reach the issue. Instead, the court merely expressed its doubt that intervention in a forfeiture proceeding could be premised on an interest acquired after the offense. The court stated in dicta: "Illegal use immediately vests title to the property in the sovereign, and cuts off the rights of third parties to obtain legally protectible interests in the property." Because *$41,305.00* was decided on a motion to intervene, the claimant apparently did not raise the innocent owner exception and the court had no reason to consider the legislative history of that provision. Therefore, in our view, *$41,305.00* is not dispositive of the issue. *See United States v. One Single Family Residence*, 683 F.Supp. 783, 786–87 n. 1 (S.D.Fla.1988) (Aronovitz, J.) (finding that *$41,305.00* left the issue open for another

day).[7]

The remaining cases relied upon by the Government are inapposite. The forfeiture statutes at issue in *Florida Dealers and Growers Bank v. United States*, 279 F.2d 673 (5th Cir.1960), and *Wingo v. United States*, 266 F.2d 421 (5th Cir.1959) did not provide an exception for innocent owners.[8] Similarly, in *United States v. Four Parcels of Real Property at Lake Forrest Circle*, 870 F.2d 586 (11th Cir.1989), and *United States v. One 1967 Chris–Craft 27 Foot Fiber Glass Boat*, 423 F.2d 1293 (5th Cir. 1970), the claimants could not demonstrate innocent ownership and therefore the court did not consider the issue.

As to *United States v. One Piece of Real Estate*, 571 F.Supp. 723 (W.D.Tex.1983), that court only held that lienholders were not entitled to interest or other charges accruing after the date of the seizure. The court did not hold that the lienholders' interests ended as of the date of the offense. *See also United States v. All That Tract and Parcel of Land*, 602 F.Supp. 307, 313 n. 11 (N.D.Ga.1985) (rejecting *One Piece of Real Estate*).

At least two courts have held that the innocent owner exception applies to bona fide purchasers, notwithstanding the relation back doctrine. In *Eggleston v. State of Colorado*, 873 F.2d 242, 247 (10th Cir. 1989), the Tenth Circuit held: "Forfeiture therefore cuts off the rights of subsequent lienholders or purchasers, subject to the so-called innocent owners exception in section 881(a)(6)." In *United States v. One Single Family Residence*, 683 F.Supp. 783 (S.D.Fla.1988) (Aronovitz, J.), another court in this district reached the same result. In addition to the legislative history, that court relied on section 881(a)(6), which governs proceeds and therefore contemplates third party recipients. The court also re-

lied in part on the criminal forfeiture statute, which expressly protects bona fide purchasers. *See also United States v. One Parcel of Real Estate*, 715 F.Supp. 360, 363 (S.D.Fla.1989) (Gonzalez, J.) (Congress did not intend "to place all land titles in doubt because of the 'relation back'" doctrine).

Indeed, more recently, the Supreme Court has suggested that a contrary result would be unconstitutional. In *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 689–90, 94 S.Ct. 2080, 2094–95, 40 L.Ed.2d 452 (1974), the Court stated:

> [I]t would be difficult to reject the constitutional claim of an owner whose property had been taken from him without his privity or consent.... Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive.

It is therefore imperative that we give effect to the legislative history of the innocent owner provision, in keeping with our duty "to avoid deciding difficult constitutional questions where the text fairly admits of a less problematic construction." *Public Citizen v. United States Department of Justice*, — U.S. —, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). If the interest of an innocent owner is protected from forfeiture, *a fortiori*, the interest of a bona fide purchaser is also protected. For these reasons, the Court concludes that a bona fide purchaser is entitled to the protection of the innocent owner exception to the civil forfeiture statute, 21 U.S.C. § 881(a)(7).[9]

---

**7.** The Eleventh Circuit has ordinarily considered the issues together. *See, e.g., United States v. Four Parcels of Real Property on Lake Forrest Circle*, 870 F.2d 586, 593–94 (11th Cir. 1989) (denying claimant relief because the forfeiture related back *and* the claimant could not prove innocent ownership).

**8.** Moreover, the court in *Florida Dealers* remanded for a determination of whether remission or mitigation should be allowed.

**9.** To the extent that *United States v. Walker*, 889 F.2d 1317 (4th Cir.1989) is to the contrary, we decline to follow it. *Walker* did not concern the precise issue before us. Instead, the court in *Walker* held that the relation back doctrine prevented heirs from acquiring an interest property

## IV. INNOCENT OWNERSHIP

Having determined that Republic may assert the innocent owner provision, the Court must now consider whether Republic has met the standard of innocent ownership. To meet the requirements of this provision, the claimant must establish that the offense was committed without its "knowledge or consent." 21 U.S.C. § 881(a)(7). Republic argues that this standard contemplates actual knowledge by the claimant. The Government argues, however, that the claimant must establish that it (1) lacked actual knowledge; (2) lacked constructive knowledge; and (3) did all that reasonably could be expected to prevent the offense. For this third element, the Government cites *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 689, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974), in which the Supreme Court stated that it might be difficult to reject the due process claim of a person who "had done all that reasonably could be expected to prevent the proscribed use of his property." The forfeiture statute at issue in *Calero–Toledo* did not provide an exception for innocent owners.

The Court notes that the Eleventh Circuit has made conflicting statements about the standard to be applied under the innocent owner provision of the civil forfeiture statute. In *United States v. Four Million, Two Hundred and Fifty–Five Thousand Dollars*, 762 F.2d 895, 906 (11th Cir.1985), the Eleventh Circuit agreed with the claimant "that the application of the statutory 'innocent owner' defense turns on the claimant's actual knowledge, not constructive knowledge." However, in a footnote, the court left "for another day the question of the *Calero–Toledo* dicta to forfeiture actions under 21 U.S.C. § 881(a)(6)." *Id.* at 906 n. 24. More recently, the Eleventh Circuit has incorporated the *Calero–Toledo* language into the standard for innocent ownership: "To prevail on a defense of innocent ownership, a claimant must prove

not only that it was uninvolved in and unaware of the activity upon which forfeiture is sought, but also that it did everything that reasonably could be expected of it to prevent the activity." *United States v. One 1980 Bertram 58' Motor Yacht*, 876 F.2d 884, 888–89 (11th Cir.1989).

■ Republic contends that the record does not demonstrate actual knowledge or consent to the purchase and construction of Miraflores with drug proceeds, or the laundering of money through the Republic loan. This "argument ignores the statutory requirement that the claimant, and not the government, bears the burden of proof on the 'innocent owner' defense. Under 21 U.S.C. § 881(a)(6), the government need not prove, and the district court need not find, that the claimant *had* actual knowledge. Rather, it is the claimant's responsibility to prove the *absence* of actual knowledge." *United States v. Four Million, Two Hundred and Fifty–Five Thousand Dollars*, 762 F.2d 895, 906–07 (11th Cir.1985).

■ The Court has found only one reported decision assessing the standard to be applied to a commercial lending institution under the innocent owner provision. In *United States v. A Fee Simple Parcel of Real Property*, 650 F.Supp. 1534 (E.D. La.1987),[10] the court held that the bank had established innocent ownership on the facts presented because (1) the borrower had a long-standing relationship with the bank; (2) the bank was not aware of any legal problems of the borrower; (3) the bank conducted a title search on the defendant property to ensure that the borrower was the true owner; and (4) even though the bank failed to obtain a financial statement from the borrower, the property was fully secured by collateral.

The conduct of the lender in *A Fee Simple* provides a study in contrast with the Miraflores transaction. The Court has distilled the trial record and we make the

---

subject to forfeiture. Moreover, the court did not even consider the legislative history of the innocent owner provision. For these reasons, we do not find *Walker* persuasive on the issue before us.

10. The Court is surprised that neither party brought this case to our attention, even though it was decided before this action was filed.

following factual findings on the issue of Republic's state of knowledge:

1. Thule, the borrower, is a Panamanian shell corporation;

2. The borrower's primary asset is a residence;

3. The residence was vacant at the time;

4. The borrower was about to sell its primary asset;

5. The lender did not ask the purpose of the loan;

6. The lender failed to conduct a title search;

7. The corporate borrower and Antonio Munoz Caballero ("Munoz"), the sole stockholder and a guarantor on the mortgage, were unknown to the lender;

8. Ramon Puentes, the second guarantor, had no known connection with the borrower;

9. Puentes made inconsistent statements of ownership;

10. The lender offered an $800,000 one-year balloon note on property valued at $1.2 million;

11. The borrower had no known source of repayment;

12. Fred de la Mata, president of Republic, was intimately involved in the transaction;

13. The lender quickly approved the loan outside normal channels;

14. The lender cannot document board approval of the loan, although documents indicate the board endorsed the loan after the closing;

15. Puentes, the guarantor, used part of the loan proceeds to buy expensive gifts for the bank president's family, and to buy an airplane ticket to Geneva for Iglesias;

16. The lender transferred the proceeds of the loan to the borrower's Swiss bank account.

There can be no question that the circumstances surrounding approval of the loan were suspicious. Republic was approached by Ramon Puentes, who claimed that he and a "partner" owned the property. However, documents reviewed by the lender show that Thule was the sole owner of the property, and that Thule's stock was, in turn, wholly owned by Antonio Munoz Caballero ("Munoz"). Yet Republic never questioned Puentes about this discrepancy, and did not even conduct a title search of the property.

The borrower, Thule, was a Panamanian shell corporation whose principal asset was a vacant residence. On this point, we adopt the testimony of Special Agent Truesdale:

> Through my experience and training I have come to learn Panamanian corporations and other offshore corporations are preferred by drug smugglers to conceal their assets, and to also form a base of what appears to be legitimate income.

> They usually do this by setting up what I would refer to as shell corporations overseas. In turn, they would set up bank accounts in the United States.

> Oftentimes, the accounts in the United States are in the name of trustee or nominee individuals. Once the money is transferred from overseas back into the United States, it is basically clean money or what we refer to as laundered money at that time.

> They will oftentimes pay taxes and do all the legalities to make things look legitimate with this money.

Transcript of Trial Testimony, at pages 22–23.

Although Puentes, the guarantor, had an existing relationship with Republic, the borrower did not. Indeed, both Thule and Munoz, Thule's sole shareholder, who agreed to sign as guarantor, were unknown to Republic. Republic did not assess Munoz' financial standing and did not even meet him until the closing. The loan was sizeable—$800,000 on a $1.2 million dollar residence, interest payments for the first year and a one-year balloon note. Yet the borrower could not demonstrate how the loan was to be repaid. The borrower was not doing business and had no source of income. Because the borrower's financial statements were not audited, a lender

would ordinarily require further proof of financial standing. Republic failed to do so, and did not even establish a repayment schedule.

Although the collateral was sufficient to cover the loan, we do not believe that banks are in the business of lending money with the intent to force sale of the property. Moreover, even though the house was for sale, the lender did not secure an undertaking by the borrower to use the proceeds of the sale for repayment of the loan. Nor did the lender ask Thule why a loan was necessary if the property was about to be sold.

The record also establishes that the president of Republic, Fred de la Mata, had an unusually close involvement in this loan transaction. De la Mata and other bank officers personally inspected the property. De la Mata claims that he presented the loan to the board for approval during a break at a convention held at the Sofitel Hotel, but he cannot document this meeting. Moreover, the only documentary evidence shows that the board endorsed the loan subsequent to the closing on the property.

Perhaps the most revealing fact in the record is Puentes' sizeable gift to de la Mata's family. Once the loan was approved, Puentes gave de la Mata's son and his fiance a Caribbean honeymoon package consisting of hotel reservations and two first-class, round-trip tickets to St. Thomas and St. Maarten. The package cost approximately $3,000. The travel agent testified that Iglesias actually booked the trip. Iglesias ordinarily paid in cash. This time, the travel agent was paid by check. The check was signed by Munoz, drawn on the new Republic account.

Finally, we note that after the loan was approved, Republic transferred the loan proceeds to Thule's Swiss bank account, through two cashiers' checks for $350,000 each. This transaction was handled by de la Mata's personal assistant.

Republic claims that many elements of this loan transaction are not unusual for South Florida. We emphasize that it is the totality of the circumstances that underlies our finding of actual knowledge. Moreover, even if the loan was not unusual for South Florida, that does not end the Court's inquiry.[11] The question is not whether this was a commercially sound loan. Rather, the Court must consider whether the lender knew that the property had been acquired with drug proceeds. An unusual loan transaction is merely evidence of the lender's knowledge. In any event, we do not believe that Republic has established commercial reasonableness on this factual record.[12]

At trial, de la Mata conceded that he did not rely on Munoz as guarantor of the loan. Nor do we believe that de la Mata relied on Thule. De la Mata testified again and again that the reason he did not investigate either Thule or Munoz was because he relied on Puentes as a long-standing customer of the bank. De la Mata expected to be paid—not by Thule, or even Munoz, but by Puentes. Yet Puentes had no known connection with either Thule or Munoz. Puentes had no known reason to agree to pay the mortgage.

The only rational conclusion is that Republic knew that Thule, a mere shell corporation, was controlled by Puentes. De la Mata must have known that Thule was a vehicle for Puentes. De la Mata knew that Puentes was trying to unload Miraflores. He did not ask why. Instead, in the face of overwhelming evidence, he chose to look the other way. De la Mata deliberately

**11.** The Government's expert testified that the loan was "unusual and unsound." The Court agrees, and we adopt the testimony of the Government's expert. Moreover, even the bank's expert admitted that the loan transaction might be considered unusual outside South Florida.

**12.** Miraflores argues that the loan must have been reasonable because another bank had offered Puentes a loan on Miraflores. That lender offered a $750,000 loan at sixteen per cent interest. Beyond those facts, the particular circumstances of that loan are not before the Court. Again, we emphasize that determining the lender's knowledge is a fact-sensitive inquiry. That loan offer may well have been improper. Even so, Republic cannot be absolved by another lender's wrongdoing.

closed his eyes to what he had every reason to believe was the truth. *See United States v. Alvarez*, 837 F.2d 1024, 1028 (11th Cir.1988) ("deliberate ignorance"); *United States v. Restrepo–Granda*, 575 F.2d 524, 529 (5th Cir.1978) ("willful blindness").

Republic argues that to deny its claim would mean that banks must become agents for the Government in investigating prospective customers. We disagree. In *United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir.1986), the Second Circuit rejected a similar argument in holding that banks might be subject to forfeiture of bank account assets derived from drug proceeds.[13] The Court stated:

Appellants contend that a broad application of the forfeiture statute to bank accounts will wreak havoc in the banking industry. They argue that banks will accept deposits at their peril, since investigation of the sources would be costly, time-consuming, and often unilluminating. The risk is vastly overstated. A bank has no duty to investigate the source of customers' deposits. It acts at its peril only when, as a passive receiver of knowledge, it learns that a deposit is derived from drug profits and nevertheless accepts that deposit. The statute imposes no investigatory costs on the banking system.

*Banco Cafetero Panama*, 797 F.2d at 1162.

Puentes was a reliable source of business. De la Mata wanted to make a profit. The honeymoon gift only sweetened the deal. However, drug proceeds are not a permissible source of business for the financial community. As the Eleventh Circuit has observed, "Those who knowingly do business with drug dealers do so at their own risk. [Claimant's] interpretation of 21 U.S.C. § 881(a)(6) would completely insulate money-launderers, and others who knowingly do business with drug dealers, from possible forfeiture of their ill-gotten gains." *United States v. Four Million, Two Hundred, Fifty–Five Thousand*, 762 F.2d 895, 905 (11th Cir.1985).

We recognize that a financial cost may attach to imposition of such a standard, in the sense of missed financial opportunity. However, Congress has determined that the financial community must bear some of the costs, because narcotics inflict a much greater cost on society. We agree with the Second Circuit that Congress did not intend to exempt banks from this mandate.

Nothing in the terms or legislative history of the forfeiture statute gives the slightest reason to believe that Congress wished to accord banks any special insulation from vulnerability to forfeiture of assets traceable to drug proceeds. On the contrary, Congressional concern with money laundering points in precisely the opposite direction.

*United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1162 (2d Cir.1986); *cf. ARCA Airlines, Ltda. v. United States Customs Service*, 726 F.Supp. 827 (S.D.Fla. 1989) (Scott, J.) (For common carriers, "[s]ecurity measures [to detect narcotics] are part of the cost of doing business. We do not find the cost excessive in view of the risk.").

The Court concludes that Republic has failed to meet its burden of showing lack of actual knowledge.[14] On the contrary, every fact in the record points irrefutably to Republic's knowing involvement. These facts, when considered in their totality, suggest actual knowledge, if not complicity, on the part of the lender.[15] Congress has sent a clear message in the recent legislation enacted that it will not permit the financial community to knowingly do business with drug dealers. This opinion merely follows that clear message. We do so with little reluctance.

---

**13.** Again, neither party has cited this decision.

**14.** Thus, like the court in *Four Million, Two Hundred and Fifty–Five Thousand Dollars*, 762 F.2d at 906 n. 24, we need not decide whether the claimant must prove that it did all that reasonably could be expected under the *Calero–Toledo* standard.

**15.** In view of these factual findings, it is not necessary for the Court to rule on the credibility of the Government's final witness, Rene J. Leonard. However, if the Court were forced to decide this issue, we would be inclined to reject Leonard's testimony.

## V. CONCLUSION

Based upon the foregoing, it is hereby ORDERED as follows:

1. The Defendant property is subject to forfeiture.

2. Republic's claim is DENIED.

3. The United States is entitled to final judgment.

4. The United States shall submit a final judgment forthwith in accordance with this opinion.

5. The Court retains jurisdiction to effectuate the terms of this order and to assess costs upon appropriate motion.

DONE and ORDERED.